UNITED STATES of America, Plaintiff–Appellee,

v.

**Jack P. KALLIN, Defendant–Appellant.**

No. 93–10765.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 10, 1995.

Decided March 17, 1995.

As Amended on Denial of Motion to Recall Mandate June 6, 1995.

---

Michelle R. Hamilton, Phoenix, AZ, for defendant-appellant.

Stephen G. Winerip, Asst. U.S. Atty., Phoenix, AZ, for plaintiff-appellee.

Before: GOODWIN and SCHROEDER, Circuit Judges, and TASHIMA, District Judge.[*]

TASHIMA, District Judge:

Defendant-appellant Jack P. Kallin ("Kallin") appeals his conviction for attempted tax evasion and subscribing to a false tax return. His primary contention is that the government's extensive questioning and comments regarding his exercise of his rights to remain silent and to retain counsel constituted prejudicial error. He also contends that the district court improperly admitted copies of corporate tax returns from years in which he was not charged with tax evasion in violation of Fed.R.Evid. 404(b). Finally, Kallin contends that the district court erred in allowing a government witness to testify that he does not like Mexicans. We reverse the conviction.

### FACTS

Kallin owned and operated three Desert Hobbies stores in Phoenix and Tempe, Arizona. Desert Hobbies was incorporated in 1982 as Kallin Enterprises, Inc., with Kallin as president, but continued to operate as Desert Hobbies. Kallin did not report personal income of more than $6,000 for any year from 1982 through 1986. He and his wife reported a joint income of $800 for 1985, and in 1986 they did not file a return. To qualify for a home mortgage, however, Kallin submitted to the lender copies of 1982 and 1983 tax returns reporting earnings of more than $50,000 per year. He purchased a $150,000 home in 1985, purchased a Cadillac in 1985, and owned an airplane as early as 1983. For the years 1985 through 1987, Kallin signed corporate tax returns indicating net operating losses for Kallin Enterprises.

Kallin separated from his wife in 1986 and his daughter Sharla initially remained with him. Sharla eventually left to live with her mother, taking Kallin's business records with her. The district court permitted Sharla to testify that Kallin dislikes Mexicans and told her to leave the house when he discovered that she had a Mexican boyfriend. In March, 1988, Sharla furnished the Desert Hobbies business records to the Internal Revenue Service ("IRS"). These records included a spiral notebook indicating receipts in excess of those reported on the corporate tax returns. Kallin claims that Sharla sought to extort $30,000 from him and delivered the records to the IRS after he refused to pay her extortionate demand.

The IRS initiated a criminal investigation and contacted Kallin concerning the business records. Before asking any questions, IRS agents advised Kallin of his non-custodial rights, including his right to remain silent and his right to retain counsel. Kallin exercised those rights by not answering any questions and seeking the advice of an attorney. The government obtained an indictment on November 27, 1991, charging Kallin and his accountant with eight counts of attempted tax evasion under 26 U.S.C. § 7201.[1] Kallin was arrested by IRS agents on December 5, 1991, and given a *Miranda* warning. He indicated at that time his desire to consult an attorney. On March 31, 1993, a superseding indictment was returned, adding a ninth count of subscribing to a false fiscal year 1987 corporate tax return, under 26 U.S.C. § 7206(1).[2]

At trial, the government presented evidence that the Desert Hobbies stores had two cash registers and the receipts of each were recorded separately. An expert witness testified that none of the receipts from the second registers were reported to the IRS, resulting in an under-reporting of approximately $1 million. Kallin testified that the records the government attributed to the second register were actually records of total receipts and the government was double-counting the receipts from the second regis-

---

[*] Hon. A. Wallace Tashima, United States District Judge for the Central District of California, sitting by designation.

1. Five of these counts related to Kallin's personal income taxes for 1982 through 1986 and three related to Kallin Enterprises' corporate taxes for fiscal years 1985 through 1987.

2. The long delay before trial was caused by the withdrawal of Kallin's counsel due to a conflict of interest and proceedings to determine Kallin's competency to stand trial.

ter. The government rebutted this assertion with testimony that the records Kallin had identified as total receipts corresponded to the tapes from the first register.

During cross-examination of Kallin and during its closing argument, the government repeatedly commented on Kallin's retention of counsel and his failure to come forward with his explanation of the two sets of records until trial.[3] Defense counsel moved for a mistrial based on this line of questioning. The district court denied the motion the following day and instructed the jury to disregard the previous day's testimony concerning Kallin's silence and retention of counsel.[4]

In closing argument, the government urged that the jury not believe Kallin:

Five years after the investigation began, Mr. Kallin came up with this story for the first time. And then he didn't wait—he waited until one week after the trial began, till the last moment of the trial. The idea, I submit to you, was to concoct a story and reveal, at the last moment, when the Government could do the least to respond to him. He's tried to fool you.

Defense counsel's timely objection to this statement was overruled.

Kallin was convicted on counts four and five (covering personal returns for 1985 and 1986) and counts seven, eight and nine (covering corporate returns for fiscal years 1986 and 1987). He was acquitted of the remaining counts. Kallin then moved for a new trial. The court denied the motion, stating,

3. The district court overruled timely objections by defense counsel to the following line of questioning:

"Q. Mr. Kallin, you didn't tell the IRS at that time [of initial contact with the IRS in 1988] that you were innocent, did you? ...

"A. Oh. No, sir, I didn't tell them I was innocent....

"Q. And you hired an attorney, a Mr. Silver. Isn't that correct? ...

"Q. And he was a criminal defense attorney? ...

"A. I don't know what Mr. Silver's credentials are.... He's an attorney....

"Q. And you retained him for more than a year. Isn't that correct?

. . . . .

"A. Yeah. I'm going to say yes. I don't know.

"Q. And over that year, or thereabouts, you never approached the IRS, with or without the advice of counsel, to tell them that you were innocent. Isn't that correct? ...

"A. Okay. I'm not sure, you know. Then fine, we'll go that route. You know, that sounds to me like good advice, I guess. That's from an attorney, so it must be good advice, to keep my mouth shut ...

"Q. At that time [of arrest], you didn't tell anybody that you were innocent and ask to be heard on that matter? ...

"A. I didn't say a thing to Mr. Shupnik [the arresting officer]. I think he thought I was the most dangerous person—

"Q. Well, you didn't say anything to Mr. Shupnik, right?

"A. No, sir, I didn't.... I was told to keep my mouth shut, in fact.

. . . . .

"Q. And ... in that time did you come forward to say that you were not guilty in this matter?

"A. I don't remember doing that, no.

"Q. Okay. In five or six years since its been brought—first suggested by the government, after Sharla took your records, this is the first time that you have told an entire story explaining how and why it is that you're innocent. Isn't that correct?

"A. Well, if I can say something. At the time I was arrested, okay, I was told—I was read my rights....

"Q. But in all the time since this matter was undertaken, this is the first time you've told a comprehensive story indicating that you are innocent. Isn't that right?

"A. Yes, sir."

4. The judge instructed the jury:

Ladies and gentlemen, you remember yesterday, during the cross-examination of Mr. Kallin, [the prosecutor] was—went into the fact that he had never denied anything before this trial, and he hired a lawyer. I want to instruct you to disregard that testimony. He doesn't have to talk to the Internal Revenue Service. He doesn't—if he knows that the Internal Revenue Service is checking him, he has—certainly has the right to seek the advice of a lawyer as to what to do.

And he was asked yesterday, "even in the past two years you haven't denied it." Well, he did deny it. He pleaded not guilty to the charge, and that's why we're here to decide it. But the fact that he has not denied it to the Internal Revenue, the fact that he's hired a lawyer, really has nothing to do with this case.

"I believe that the evidence against Mr. Kallin is overwhelming. To be honest, I really don't understand how the jury could have acquitted him of any of the counts. And I think that my instruction to the jury was pretty emphatic...."

### STANDARDS OF REVIEW

■ Whether improper references to a defendant's silence and retention of counsel are harmless is reviewed under a "harmless-beyond-a-reasonable-doubt" standard. *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993).

■ "[T]he issue of whether the evidence falls within the scope of Rule 404(b) is reviewed de novo." *United States v. Arambula–Ruiz,* 987 F.2d 599, 602 (9th Cir.1993); *United States v. Mundi,* 892 F.2d 817, 820 (9th Cir.1989), *cert. denied,* 498 U.S. 1119, 111 S.Ct. 1072, 112 L.Ed.2d 1178 (1991). A trial court's decision to admit evidence of other crimes pursuant to Fed.R.Evid. 404(b) is reviewed for abuse of discretion. *Id.; United States v. Hill,* 953 F.2d 452, 455 (9th Cir.1991). "We review the district court's decisions balancing the probative value of evidence against its prejudicial effect for abuse of discretion." *United States v. Kessi,* 868 F.2d 1097, 1107 (9th Cir.1989). "The district judge is given wide latitude in determining the admissibility of evidence under this standard." *United States v. Kinslow,* 860 F.2d 963, 968 (9th Cir.1988), *cert. denied,* 493 U.S. 829, 110 S.Ct. 96, 107 L.Ed.2d 60 (1989). The district court's determination of whether or not evidence is relevant under Rule 402 is also reviewed for abuse of discretion. *United States v. Schaff,* 948 F.2d 501, 505 (9th Cir.1991).

■ Under the abuse of discretion standard, a reviewing court cannot reverse unless it has a definite and firm conviction that the district court committed a clear error of judgment in reaching its conclusion or based its decision on an erroneous conclusion of law. *United States v. Plainbull,* 957 F.2d 724, 725 (9th Cir.1992); *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec,* 854 F.2d 1538, 1546 (9th Cir.1988).

### DISCUSSION

**I. Prosecutorial Comment on Kallin's Silence and Retention of Counsel**

■ The government admits that it violated Kallin's due process rights by repeated references to his retention of counsel and failure to come forward earlier with his explanation of innocence, but argues that the error was harmless. "[I]t does not comport with due process to permit the prosecution during trial to call attention to [the defendant's] silence...." *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976); *United States v. Foster,* 985 F.2d 466 (9th Cir.1993). The reasoning of *Doyle* extends to comments on a defendant's decision to retain counsel. *United States v. Daoud,* 741 F.2d 478, 480–81 (1st Cir.1984); *United States v. McDonald,* 620 F.2d 559, 562–63 (5th Cir.1980). "The right to counsel is included in the *Miranda* warnings, and as such is covered by the implicit assurance that invocation of the right will carry no penalty." [5] *Daoud,* 741 F.2d at 480.

■ The government bears the burden of proving that the admitted errors pass muster under the harmless-beyond-a-reasonable-doubt standard. *Brecht,* —— U.S. at ——, 113 S.Ct. at 1717. The court must determine "whether the prosecutor's conduct was harmless by 'considering the extent of comments made by the witness, whether an inference of guilt from silence was stressed to the jury, and the extent of other evidence suggesting defendant's guilt.'" *Foster,* 985 F.2d at 468 (quoting *United States v. Newman,* 943 F.2d 1155, 1158 (9th Cir.1991)).

The mandate of *Doyle* is that the prosecution not call attention to a defendant's silence. Where one impermissible question about a defendant's silence was asked and an

---

5. The government concedes error as to impeachment based on both post-Miranda warning silence and pre-Miranda warning silence because the IRS administered a non-custodial warning at the outset which advised Kallin of his right to remain silent and his right to counsel. The IRS warnings, like Miranda warnings, contain an implicit assurance that the assertion of the right will carry no penalty. *Doyle,* 426 U.S. at 618, 96 S.Ct. at 2245.

immediate objection was sustained before the question was answered, the court did not find a violation of *Doyle* because, through this minor slip, the prosecutor had not been allowed to impeach the defendant or call attention to his silence. *Greer v. Miller*, 483 U.S. 756, 764, 107 S.Ct. 3102, 3108, 97 L.Ed.2d 618 (1987). This Circuit has found that three improper questions and answers required reversal, despite a strong jury instruction to disregard the questions. *Newman*, 943 F.2d at 1158. Seven questions about a defendant's silence, answered after an objection was overruled, followed by a comment during closing argument, were sufficiently harmful to require reversal. *Foster*, 985 F.2d at 468–69. Only five impermissible questions and a comment in closing argument formed the error in *Doyle* itself. 426 U.S. at 613–14, 96 S.Ct. at 2242–43.

The extent of error in the case at bench far exceeds these examples. The prosecutor's line of questioning and closing remarks were not inadvertent but were calculated so that an inappropriate "inference of guilt from silence was stressed to the jury...." *Foster*, 985 F.2d at 468 (citing *Newman*, 943 F.2d at 1158). An impermissible implication again was permitted, without any curative instruction, when the prosecutor argued in closing that "Mr. Kallin came up with this story for the first time" at trial.

■ At the hearing on Kallin's motion for a mistrial, the prosecutor stated:

> Obviously what I'm trying to do is show that it's mighty late in the day to be coming up with a story that you're innocent, if in fact you're innocent.... [T]here's certainly an implication that can be drawn ... that if you don't go to the government and tell them that you're innocent, then perhaps you're lying at trial when you say for the first time that you're innocent.

This is precisely the inference that *Doyle* forbids. "Notwithstanding the instructions from the trial judge, the effect of those state-ments, ... was to suggest to the jury that [the defendant] must have been guilty because an innocent person would not have remained silent." *Newman*, 943 F.2d at 1158. In this case, the government did not simply bring Kallin's silence and retention of counsel to the attention of the jury, but actively encouraged the jury to draw an inference of guilt.

Although the government admits that the error was "extensive," it argues that the error was harmless in the overall context of the trial, including the district court's curative instruction and definitive evidence of guilt.

### A. The Curative Instruction

■ The district court instructed the jury to disregard Kallin's testimony that Kallin "had never denied anything before this trial, and he hired a lawyer." The instruction was not contemporaneous with the error and was not given until the day following the improper line of questioning, long after the impermissible inference was implanted in the minds of the jury. In giving his instruction to the jury, the judge reiterated the impermissible content of the testimony, again calling attention to defendant's silence.

The court "normally presume[s] that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions...." *Greer*, 483 U.S. at 766 n. 8, 107 S.Ct. at 3109 n. 8 (citing *Richardson v. Marsh*, 481 U.S. 200, 208, 107 S.Ct. 1702, 1707–08, 95 L.Ed.2d 176 (1987)). This presumption, however, is "rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation...." *Richardson*, 481 U.S. at 211, 107 S.Ct. at 1709. With regard to "an explicit statement the only issue is, plain and simply, whether the jury can possibly be expected to forget it

in assessing the defendant's guilt." *Id.* at 208, 107 S.Ct. at 1708.

The government argues that the jury's ability to follow the court's instruction is evidenced by its failure to convict on all counts.[6] In support of drawing such an inference from the split verdict, the government cites cases dealing with a jury's ability to compartmentalize information in multiple defendant cases. *United States v. Unruh,* 855 F.2d 1363, 1374 (9th Cir.1987) ("The best evidence of the jury's ability to compartmentalize the evidence is its failure to convict all defendants on all counts."), *cert. denied,* 488 U.S. 974, 109 S.Ct. 513, 102 L.Ed.2d 548 (1988); *United States v. Baker,* 10 F.3d 1374, 1390 (9th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994).

In the context of this case, where the information to be disregarded applied equally to *all* counts, the split verdict is ambiguous; it could just as well indicate that the jury was predisposed to acquit on all counts but was influenced to partially convict by the *Doyle* violation. The partial acquittal indicates that the government's case was not definitive and that the jury's consideration of the impermissible inference may have been a factor resulting in conviction on some counts. This court cannot conclude that the jury's split verdict provides any evidence of its ability to follow the district court's curative instruction. Given the extent of the error and the delay in the curative instruction, we do not believe that the jury could "possibly be expected to forget it in assessing the defendant's guilt...." *Richardson,* 481 U.S. at 208, 107 S.Ct. at 1708.

### B. Extent of Other Evidence

■ The government argues that the error was harmless because, as the district court stated, the evidence of Kallin's guilt was overwhelming. The evidence included the personal income and business losses that Kallin reported in contrast to his substantial purchases during the same time period, the alternate tax returns that Kallin produced to qualify for a mortgage, testimony of Kallin's family and employees, and Kallin's business records.

The government admits that Kallin presented an alternative version of the facts and that "if defendant's account were true, as he insisted, the business receipts reported on the Desert Hobbies returns were not false at all." However, it claims its rebuttal case demonstrated that Kallin's version could not be true. Still, the government's admission concerning the importance of the jury's credibility assessment "only serves to underscore the critical nature of [defendant's] own testimony and the prejudicial effect of the government's use of the post-arrest silence." *Foster,* 985 F.2d at 469. The inference of guilt based on Kallin's silence was firmly planted in the minds of the jurors and undoubtably contributed to the government's undermining of Kallin's credibility.

The error in this case infected the jury on the crucial issue of credibility and the government has not proven beyond a reasonable doubt that the error did not influence the outcome of the case. We have noted our concern "that appropriate steps be taken to assure a high level of professional advocacy for prosecutors.... We perceive no valid excuse for this violation of [Kallin's] rights and reverse [his] conviction because of it." *Id.* The prosecutorial misconduct in the instant case was similarly inexcusable and a conviction based on such egregious error cannot be allowed to stand. We reverse and remand for a new trial.

## II. Admission of Tax Returns and Statement of Racial Bias

Because the same issues will likely arise on remand, we find it necessary to rule on Kallin's remaining assignments of error.

### A. Admission of Tax Returns

■ Kallin argues that the district court erred in admitting into evidence the Kallin Enterprises corporate tax returns for the fiscal years 1982 through 1984. The statute of limitations prevented prosecution based on

---

**6.** The district court agreed with this reasoning and noted that the "fact that the jury acquitted him of three or four counts suggest[s] to me that they followed my instructions. In other words, they did not let his silence affect them."

Kallin Enterprises taxes for fiscal years 1982 through 1984, but Kallin was indicted concerning his personal income taxes for this period. Kallin contends that the challenged returns were utilized at trial to establish defendant's propensity to file false corporate returns in violation of Fed.R.Evid. 404(b).

The government contends that Kallin's under-reporting of income on corporate returns was integral to his scheme to evade his personal income taxes and "[e]vidence should not be treated as 'other crimes' evidence when 'the evidence concerning the [other] act and the evidence concerning the crime charged are inextricably intertwined.'" *Mundi*, 892 F.2d at 820 (quoting *United States v. Aleman*, 592 F.2d 881, 885 (5th Cir.1979)).

The 1982 through 1984 corporate returns showed corporate losses and reported no salary paid to Kallin, so that the government had to establish that these returns were false before it could establish Desert Hobbies as a source of Kallin's alleged unreported personal income. Kallin asserts that the government never linked the challenged returns to Kallin's personal returns. Despite alleged inconsistencies in the government's actual use of the returns at trial, Kallin's personal and corporate returns were prepared by the same accountant throughout the period in question and the government contention that the various returns were linked is persuasive. Because the challenged returns are inextricably intertwined in the larger scheme, they are not 404(b) evidence and the district court did not err in admitting them.

**B. Admission of Statement Concerning Racial Bias**

Kallin argues that the district court erred in allowing Sharla to testify that he dislikes Mexicans. The government contends that the statement was relevant to Sharla's credibility because it explained why she left Kallin's home and took his business

records. However, Sharla's credibility was not in issue. Her only part in the case was to supply certain of Kallin's business records to the IRS. The authenticity of these records was never questioned. Thus, the reason Sharla left Kallin was not probative of any matter at issue in the case. The challenged testimony was not relevant. Fed.R.Evid. 401 (relevant evidence is evidence that "has a tendency to make the existence of *any material fact* more ... or less probable" (emphasis added)). The district court abused its discretion in admitting it. *Schaff*, 948 F.2d at 505. Even if the evidence had some slight probative value, its prejudicial effect far outweighed any probative value and it should not have been admitted under Fed.R.Evid. 403.[7]

**REVERSED and REMANDED.**

---

7. At least one member of the jury has a Hispanic surname, but that is not the point.

   It does not take much imagination to understand how such grossly biased comments would be viewed by the jury. We need not know the racial composition of the jury, for nearly all citizens find themselves repelled by such blatantly racist remarks and resentful of the person claimed to have uttered them. *United States v. Ebens*, 800 F.2d 1422, 1434 (6th Cir.1986). The only purpose this evidence could serve would be to prejudice the jury against Kallin.