**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William ROSS, Defendant–Appellant.**

No. 95–50282.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 4, 1997.

Decided April 22, 1997.

Amended Aug. 21, 1997.

Patricia A. Donahue, Assistant United States Attorney, Los Angeles, CA, for plaintiff-appellee.

William J. Genego, Law Offices of William J. Genego, Santa Monica, CA, for defendant-appellant.

Before: BOOCHEVER, KOZINSKI and JOHN T. NOONAN, Circuit Judges.

Opinion by Judge BOOCHEVER; Concurrence by Judge NOONAN.

BOOCHEVER, Circuit Judge:

Defendant William Ross was convicted of aiding and abetting the mailing of an explosive device with the intent to harm or kill, in violation of 18 U.S.C. §§ 1716(a) and 2. Ross filed a timely appeal. He contends that insufficient evidence supported his conviction, that preindictment delay violated his due process rights, and that the prosecution violated his Fifth Amendment rights by questioning him at trial about his retention of counsel and his post-*Miranda* silence. We have jurisdiction under 28 U.S.C. § 1291, and we affirm the district court.

## FACTS

In 1980, a box was mailed to Brenda Crouthamel (now Brenda Adams ("Adams")) at her place of work. The box contained a bomb that exploded and killed Adams's secretary, Patricia Wilkerson. The box and its accompanying letter were analyzed and latent prints were discovered. What was originally thought to be a palm print was later discovered to be a thumb print belonging to Robert Manning ("Manning"). Prints on the letter matched those of Manning's wife, Rochelle Manning. Investigators suspected that William Ross ("Ross") had arranged for Manning to kill Adams because of a real estate deal that went sour. *See United*

*States v. Manning,* 56 F.3d 1188 (9th Cir. 1995).

In 1977, Adams filed a lawsuit against Ross, a real estate broker, and his brother Arthur Ross seeking to enforce an agreement to sell Adams a house. While Arthur owned the house, the government presented evidence that Ross was the real party in interest, that Arthur was merely a straw borrower, and that Ross alone would enjoy the profits or suffer the losses from the sale. Adams testified that settlement negotiations had been contentious and that Ross accused her of trying to cheat him and that he called her names. Adams wanted Ross to pay for approximately $5000 in repairs. Ross also stood to lose close to an additional $60,000 by going through with this agreement because the house was now worth much more than the amount for which he and Arthur had agreed to sell it to Adams. Adams and Ross last spoke on June 30, 1980, but reached no agreement.

That same day, two weeks before the bomb killed Wilkerson, a one-minute telephone call was placed from Ross's office to a number belonging to Manning at the Conference of Jewish Activists ("CJA"). Later that evening a two-minute call was placed from Ross's office to Manning's home. These were the only calls from Ross's office to either the CJA or Manning's home in 1980.

Ross and Manning were both members of the CJA, as well as of another Jewish organization. Manning was the defense minister of the second organization and an executive with the CJA. Marilyn Annis, also a member of the CJA, testified that she had seen Ross arrive at a meeting that Manning was conducting and that Manning asked Ross to stay until it was over. Others testified that they had seen Ross and Manning at the same fundraising parties and that Ross was a dependable contributor to both organizations.

Shortly after the bombing, Ross, who had changed his name from Rothstein in 1946, obtained a copy of his Rothstein birth certificate. In September 1981, Ross, disguised in a beard and glasses, used this birth certificate to apply for a driver's license in that name. In February 1983, again disguised, he used the license and birth certificate to apply for a passport.

Manning and his wife emigrated to Israel in 1981. In 1988, an investigator identified prints on the box containing the explosives as Manning's. After the identification of the prints, Manning and his wife were indicted and the government sought extradition. The extradition process continued for years. In the meantime, Ross was indicted in 1988 for aiding and abetting the offense, and his trial ended with a deadlocked jury and a mistrial in January 1989. The government dismissed the indictment without prejudice.

In July 1993, Manning was finally returned to Los Angeles. The day Manning arrived in the States, Ross moved to Vancouver, Canada, where he used the Rothstein alias, as well as those of "Charles Miller" and "Robert Levy". In November 1993, Ross was arrested in Vancouver. Detectives found among his belongings: an envelope addressed to Charles Miller containing U.S. passport applications, Canadian money orders issued to Robert Levy and William Rothstein, Mexican travel brochures addressed to Robert Levy, the Rothstein driver's license, Canadian citizenship information, documents explaining the extradition treaty between the United States and Canada, and a list of countries that appeared to be those with which the United States did not have extradition treaties.

The government obtained a superseding indictment, again charging Ross with aiding and abetting the offense, and Ross agreed to return to the United States for trial. In 1993, Manning was tried alone and found guilty. Ross was retried in 1994. He took the stand in his own defense, many witnesses testified to his good character, and again the jury deadlocked. At his third trial in early 1995, Ross attempted to put on the same witnesses, but the trial judge sustained the government's objection to the character evidence. Ross again took the stand, and he insinuated that either his son, who had since died in a car accident, or his brother was responsible for the bombing rather than himself. At the conclusion of this third trial, Ross was found guilty and sentenced to life imprisonment.

## ANALYSIS

### I. Sufficiency of the Evidence

 Ross first argues that insufficient evidence supported his conviction. There is sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Jones,* 84 F.3d 1206, 1210 (9th Cir.) *cert. denied,* —— U.S. ——, 117 S.Ct. 405, 136 L.Ed.2d 319 (1996). Ross was charged with and convicted of aiding and abetting the mailing of an explosive device with the intent to injure or kill. To convict a defendant of aiding and abetting, the government must prove that the defendant knowingly committed an act with the purpose of aiding the commission of a crime that was later committed. *See United States v. Ramos–Rascon,* 8 F.3d 704, 710 (9th Cir.1993).

 Ross contends that no rational jury could have found beyond a reasonable doubt that he committed an act in furtherance of the bombing, as required in order to be convicted as an aider and abettor. We disagree.

The prosecution presented the jury with evidence of Ross's motive to have Adams killed, as well as with reams of evidence regarding Ross's flight to Canada under assumed names. While, as Ross asserts, there may be explanations other than consciousness of guilt for Ross's flight, a jury could reasonably find that his extraordinary efforts to leave the country were undertaken to avoid detection because he had Manning mail a bomb to Adams. Moreover, there was testimony from Marilyn Annis and others of Ross's association with Manning. In addition, two phone calls were placed from Ross's business, one to the CJA office and one to Manning's residence. A jury could infer that Ross placed those calls to Manning, and Ross does not dispute the fact that Manning mailed the bomb that killed Wilkerson.

In sum, Ross had had associations with Manning; two telephone calls were placed from Ross's business to Manning's office and residence, and it was Manning who mailed a bomb to Adams's workplace; Manning had no known tie to either Adams or Wilkerson; Ross had a motive to kill Adams; Ross was among the few who knew Adams's temporary work address to which the bomb was mailed; Ross knew Adams was in computer sales and the letter accompanying the bomb describes her as in computer sales; Ross did not know that Adams had married and the letter accompanying the bomb was addressed to Adams in her maiden name; Ross transferred all of his property to his wife within two weeks of the bombing; and Ross falsely denied that he knew Manning. Moreover, Ross evidenced a consciousness of guilt through his evasion tactics. He obtained a false birth certificate, driver's license, and passport. In 1991 Ross prepared for Manning's extradition by creating a list of phone numbers for covert communications with his wife and by obtaining information about British Columbia. Finally, the day Manning was extradited to the United States, Ross fled to Canada via his falsified passport.

The convergence of the evidence is beyond chance or coincidence to explain. The furtive, bizarre, or criminal actions of Ross are closely tied to the fear of apprehension for the bombing and the fear that Manning would give him away. The evidence does not show the content of the two telephone calls, but it does show that Ross must have counseled Manning to send his deadly device. With this evidence, a rational trier of fact could have found beyond a reasonable doubt that Ross telephoned Manning and committed an act with the purpose of aiding the commission of the crime.

### II. Preindictment Delay

 Ross contends that the extended delay between the time of the bombing and his trials violated due process. He moved for the district court to dismiss the indictment based on this delay, but the court denied the motion. The trial court's decision on a defendant's motion to dismiss charges for preindictment delay is reviewed for abuse of discretion. *United States v. Martinez,* 77 F.3d 332, 335 (9th Cir.1996); *Manning,* 56 F.3d at 1193.

 Preindictment delay that results from negligence or worse may violate due process.

*See United States v. Swacker,* 628 F.2d 1250, 1254 n. 5 (9th Cir.1980) (some government culpability must be shown to prove a deprivation of due process). Whether due process has been violated is decided under a balancing test and "[i]f mere negligent conduct by the prosecutors is asserted, then obviously the delay and/or prejudice suffered by the defendant will have to be greater." *United States v. Moran,* 759 F.2d 777, 782 (9th Cir.1985) (as amended). The defendant must show actual prejudice from the delay, and the court must balance the length of the delay with the reasons for the delay. *Id.* at 782–83.

> After making the balancing determination, a pre-indictment delay will be permissible unless it violates fundamental conceptions of justice which lie at the base of our civil and political institutions. Furthermore, in this area, the due process clause plays a limited role because primary protection is afforded to defendants by the applicable statute of limitations.

*Id.* at 782 (citation omitted).

In all, there were more than twelve years of preindictment delay. That delay can be broken up into two separate time periods with a different reason behind each. We analyze below each of these periods separately to determine whether it violated due process.

## A. Delay Before the First Trial

■ Eight years after the mail bomb killed Wilkerson, a grand jury indicted Ross and Manning for the first time. This delay occurred because of a postal inspector's error. The box that delivered the bomb contained thumb prints that the inspector mistook for palm prints. When the inspector received Manning's fingerprints in 1981, he did not compare them with the prints on the box. He believed that they could not match because those on the box belonged to a palm and Manning's were of fingers and a thumb. Eight years later, the inspector received Manning's fingerprints for a third time, this time along with his palm print. While comparing the print card with the discovered prints, the inspector realized that the box indeed carried a thumb print and that it belonged to Manning. Shortly thereafter, Manning and Ross were indicted (along with Rochelle Manning, who has since died).

Assuming without deciding that the inspector's mistake was negligent, we must determine whether the delay caused Ross actual prejudice. *Moran,* 759 F.2d at 782–83.

Ross contends that the delay prejudiced his trial because during the intervening eight years his son and potential witness, Peter Ross, died. Ross presented evidence at trial that Peter not only was friends with Manning but worked with Ross and could have made the two telephone calls from the office to Manning. Ross strongly implied that his son (who he claimed had a "darker side" and a drug problem) may have been involved in the bombing. He claims that Peter's testimony would have established Peter's relationship with Manning (and Ross's lack thereof) and that it would have "established that if anyone called Manning from the Bill Ross Realty office on June 30, it would have been [Peter], not his father." Ross also claims that Peter's testimony would have impeached the testimony of Marilyn Annis, testimony that linked Manning and Ross as at least acquaintances. Finally, Ross complains of prejudice because the government argued that Ross pointed the finger at his late son, who could not defend himself, as a convenient way of avoiding guilt; Ross argues that the presence of Peter at trial would have bolstered his defense, not belied it.

All this prejudice is speculative. A defendant claiming preindictment delay carries a "heavy burden" of showing actual prejudice that is "definite and not speculative." *Moran,* 759 F.2d at 782; *United States v. Butz,* 982 F.2d 1378, 1380 (9th Cir.1993). In fact, this court wondered in *Moran* whether lost testimony can ever constitute actual prejudice given its generally speculative nature. *Moran,* 759 F.2d at 782.

Although Ross claims that Peter would have established that "if anyone called Manning from the Bill Ross Realty office it would have been [Peter]," he does not claim to know that Peter in fact called Manning from the office on that day or any other. Ross also contends that Peter would explain that he was friends with Manning and that Ross was not. First, testimony that Peter and

Manning knew each other was given by three other witnesses, thus Ross was not prejudiced by Peter's inability to provide this cumulative testimony. Second, given that other evidence established Ross and Manning as at least acquaintances, Ross's claim that Peter would explain that the two did not know each other is speculative at best.

Everything that Ross claims Peter would have testified to is either speculative or cumulative. There is no proof that Peter's absence at the first trial caused actual prejudice to Ross's defense.

Because no actual prejudice occurred, we need not weigh the reasons for the delay versus its length. *Moran,* 759 F.2d at 781.

### B. Delay Between the First and Second Trials

■ Four and a half years passed between Ross's first mistrial and his second trial. Rather than retrying Ross within the time prescribed by the Speedy Trial Act, 18 U.S.C. § 3161(e), the prosecution chose to dismiss the indictment without prejudice. The government wanted to postpone retrying Ross in order to try him jointly with Manning, who had yet to be extradited from Israel. The time between the dismissal of a first indictment and the issuing of a second is generally considered preindictment delay and analyzed under due process principles. *United States v. Hayden,* 860 F.2d 1483, 1486 (9th Cir.1988). Even if it were well known that the government would reindict, that fact would not be legally significant. *Id.* at 1486 n. 3. Any bad faith on the part of the prosecution is considered when weighing the length of the delay against the reasons for it, in order to decide whether a preindictment delay violates the due process clause. *See Moran,* 759 F.2d at 782 (where intentional governmental conduct is alleged, defendant need show less resulting delay and/or prejudice).

After Ross was recharged, his counsel deposed the original prosecutor on the case about why she chose to postpone retrying Ross. The prosecutor admitted that she wanted to wait until Manning had been extradited because the likelihood of convicting Ross without Manning's presence at trial was slim.

While prosecutors are generally free to try defendants jointly, the reason for this is efficiency and economy. Here, where the prosecutor admitted that the decision to join was made in order to increase the odds of conviction, the decision is more questionable. *See, e.g., United States v. Lovasco,* 431 U.S. 783, 794–95, 795 n. 17, 97 S.Ct. 2044, 2051, 2051 n. 17, 52 L.Ed.2d 752 (1977) ("tactical" delay is impermissible, but delay caused by the ongoing investigative process is not); *United States v. Marion,* 404 U.S. 307, 325, 92 S.Ct. 455, 466, 30 L.Ed.2d 468 (1971) (delay that is neither "tactical" nor actually prejudicial is permissible); *United States v. Sherlock,* 962 F.2d 1349, 1355 (9th Cir.1989) (delay caused by investigation permissible). We need not decide, however, whether the prosecution acted in bad faith because we hold that Ross suffered no actual prejudice from the government's delay in reindicting him.

As explained above, Ross must show some form of actual prejudice before we need balance the factors to determine whether his due process rights were violated by the delay. As we have already established, Ross can show no actual prejudice from the loss of Peter as a witness. Between the first trial and the second, however, several potential witnesses died, and Ross alleges that other key witnesses suffered memory losses.

Three of the witnesses who died testified at Ross's first trial. Ross could have introduced the trial transcripts of that testimony and therefore was not prejudiced by their absence.[1] The fourth deceased potential witness did not testify at the first trial, but Ross has not shown what this witness would have testified, and thus any prejudice is speculative.

Ross further claims prejudice from the possible memory loss of witness Marilyn Annis. Annis played an important role in linking Manning and Ross, and Ross claims it

---

1. Apparently Ross did seek to have some of this testimony introduced, but the trial judge kept it out as inadmissible character evidence. Had the witnesses been present at the third trial, they would not have been permitted to testify regarding such character evidence. Thus no prejudice occurred from keeping these portions of the transcript out.

prejudiced his defense that she was unable to remember key details of a meeting that she testified both Ross and Manning had attended. Annis had earlier told a postal inspector that she only saw Ross enter the CJA as she was leaving, while at trial she indicated that Ross and Manning communicated during a meeting. Ross, however, had the opportunity to impeach Annis with her prior statement.

Ross's final claim of prejudice, the potential memory loss of a contractor who was present at a meeting between Ross and Adams, is likewise speculative. There is no evidence that the contractor's testimony could have aided the defense.

Because we find that Ross was not prejudiced by the four-year-plus delay, we need not balance the delay with the reasons behind it.

### III. *Miranda* Violations

At Ross's third trial, the prosecution used both cross-examination and closing argument to point out that Ross had engaged counsel and that he had failed to come forward with an exculpatory story prior to trial. Throughout cross-examination, the government repeatedly referred to Ross's reliance on his attorneys, asking for example, "[D]uring the various breaks in this proceeding during your testimony you've spoken with attorneys," and "[Y]ou hired an attorney up in Canada to prevent the return of the documents that were seized from the apartment in Vancouver, correct?" The prosecutor also asked several questions regarding Ross's suggestion, made for the first time at his third trial, that either his brother or his son was involved in the murder. During closing argument, the prosecutor summed up Ross's answers in the following manner:

> [A]nd at no time between the end of the first trial in January of 1989 and his arrest in Canada, over four years later in November of 1993—at no time did he come forward to postal inspectors and tell them about his son's alleged involvement in this murder. If he really believed his son was guilty he could have come forward, cleared his name....

■ Ross argues that the prosecutor's references to his retention of counsel and his

post-*Miranda* silence violate the Fifth Amendment. Under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a defendant enjoys rights to counsel and to remain silent. As a necessary corollary, the government is prohibited from using against a defendant his decision to exercise those rights. *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976); *United States v. Kallin,* 50 F.3d 689, 693 (9th Cir.1995) (as amended).

■ We review de novo whether the prosecution's references to Ross's counsel and silence violated this prohibition. *United States v. Mende,* 43 F.3d 1298, 1301 (9th Cir.1995) (whether comment on defendant's silence violated the Fifth Amendment reviewed de novo). If the prosecution improperly referred to either defendant's retention of counsel or his silence, that error requires reversal unless it was harmless beyond a reasonable doubt. *Kallin,* 50 F.3d at 693.

### A. Trial References to Ross's Retention of Counsel

■ In his reply brief, Ross concedes that in almost all instances, either he or his trial attorney first mentioned his retention of counsel. He further concedes that "there was no harm or error in the government eliciting the same information." Ross continues to contend, however, that the prosecution's reference to Ross's counsel in other contexts violates *Miranda.* Aside from the discussions that were proper exploration of Ross's retention of counsel, a topic to which Ross had already opened the door, we hold that the references to counsel were proper impeachment. *See Geders v. United States,* 425 U.S. 80, 89–90, 96 S.Ct. 1330, 1336, 47 L.Ed.2d 592 (1976) (asking whether defendant reviewed testimony with a lawyer is proper impeachment).

### B. Trial References to Ross's Silence

■ At trial, the prosecution asked Ross several questions regarding why he did not go to the authorities with his suspicions that either Peter or Arthur Ross were involved in the bombing. The questions were meant to impeach Ross's story, told for the first time

at Ross's third trial, that his relatives must have made the calls to Manning, and therefore that the wrong Ross was on trial.

The prosecutor's questions referred only to the years between the first and second trials. The government argues that Ross was not protected by *Miranda* warnings between the two trials, and that the references to his silence during that time period were therefore permissible impeachment. In general, the prosecution is free to impeach a defendant based on his silence when that silence does *not* follow *Miranda* warnings. *See Fletcher v. Weir*, 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490 (1982) (per curiam) ("In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law ... to permit cross-examination as to postarrest silence when a defendant chooses to take the stand."); *United States v. Harris*, 726 F.2d 558, 559 (9th Cir.1984) ("prosecutors may argue inferences from silence in order to impeach testimony when the silence was not the result of *Miranda* warnings").

Ross first received his *Miranda* warnings during his 1988 arrest. In 1989, the government dismissed the indictment against him. The caselaw does not delineate how long *Miranda* warnings protect a defendant or at what point that protection evaporates. *See, e.g., United States v. Balter*, 91 F.3d 427, 439 (3rd Cir.) (as amended) ("It may be that a defendant's silence immediately after receiving *Miranda* warnings is more likely to represent the exercise of *Miranda* rights than is a defendant's silence for an extended period of time after the receipt of warnings ...."), *cert. denied*, — U.S. —, 117 S.Ct. 517, 136 L.Ed.2d 406 (1996). Whether Ross was still operating under assurances of his right to remain silent years after officials had instructed him on that right is uncertain. We need not decide, however, whether the prosecution's questions improperly referred to a time when Ross's silence was protected by *Miranda*, because if it were error it was harmless beyond a reasonable doubt. *See United States v. Burrows*, 36 F.3d 875, 880

(9th Cir.1994) (erroneous jury instruction that undermined defendant's credibility harmless beyond a reasonable doubt where defendant's credibility already very seriously damaged). The questions were meant to impeach Ross by implying that he lied on the stand about his brother and his son. Ross's credibility, though, had already been repeatedly impeached. The prosecution presented the jury with evidence of more than twenty lies allegedly told by Ross, many in his effort to flee the United States. We cannot see how the mention of another lie could have changed the jury's opinion regarding Ross's trustworthiness in the face of a false passport, a false birth certificate, and reams of evidence of fabrications and inconsistencies.

## CONCLUSION

We hold that sufficient evidence supports Ross's conviction; that Ross suffered no actual prejudice from the preindictment delay; that trial references to Ross's counsel were not improper; and that any error in the prosecution's reliance on Ross's silence was harmless beyond a reasonable doubt. Accordingly, Ross's conviction is AFFIRMED.

NOONAN, Circuit Judge concurring:

I concur in almost all of the opinion but have two differences: I don't believe the telephone calls count as evidence of Ross's crime. I do not think that Ross was protected by the Miranda warnings after the first indictment was dismissed.