Alejandro MADRID, Carlos Lutz, Ronnie Dewberry, Steven Villa, Bruce Vorse, and Moses Johnson, Plaintiffs–Appellees,

v.

James GOMEZ, Steven Cambra, Susan Steinberg, M.D., Robert Ayers, Defendants–Appellants.

Alejandro MADRID, Carlos Lutz, Ronnie Dewberry, Steven Villa, Bruce Vorse, Moses Johnson, Plaintiffs–Appellees,

and

Salvador Garcia, Intervenor–Plaintiff,

v.

James GOMEZ, Steven Cambra, Susan Steinberg, M.D., Robert Ayers, Defendants–Appellants,

and

T.K. Boyll, Sgt., Mark Bray, Correctional Officer, John Hagar, Special Master, Defendants.

Nos. 96–17277, 97–16237.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1998.

Decided July 2, 1998.

William Jenkins (argued), Deputy Attorney General, San Francisco, CA, for defendants-appellants.

David S. Steuer, Susan A. Creighton, and Ellen Solomon (argued), Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA; Donald Specter and Steven Fama, Prison Law Office, San Quentin, CA, for plaintiffs-appellees.

Before: WOOD,** HALL, and O'SCANNLAIN, Circuit Judges.

** The Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Circuit, sitting by designation.

O'SCANNLAIN, Circuit Judge:

We must decide whether the attorney's fee-limitations provisions of the Prison Litigation Reform Act of 1995 apply to cases which were pending at the time of its enactment.

**I**

This case arose as a prisoner civil-rights class action challenging the conditions of confinement at the Pelican Bay State Prison in California. Plaintiffs–Appellees Madrid and others ("prisoners") alleged a multitude of constitutional violations, including a pattern and practice of excessive force against them, provision of inadequate medical and psychiatric care, and failure to maintain humane housing conditions. After a three-month trial, the district court verified many of the prisoners' complaints. Finding numerous constitutional infirmities, and concluding that Defendants–Appellants California Department of Corrections Director Gomez and others ("prison officials") would not rectify these problems on their own, the court ordered the parties to collaborate in developing and implementing a remedial plan.

Anticipating that the district court would also order the prison officials to pay the prisoners' legal expenses during the remedial phase—and seeking to minimize the procedural burdens associated with periodic fee awards—the parties stipulated to, and on September 21, 1995, the district court authorized, an "informal process" of expediting the payments of attorney's fees. Pursuant to this stipulation, which reflected the law at the time, *see Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 561, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), the prison officials were to pay fees at the current market rate for all legal services that were useful and necessary to ensure compliance.[1] If the prison officials ever disputed

1. The district court found that most private attorneys in the Bay area charged hourly rates ranging from $100 upward to $375 or $400, de-

an amount and refused to pay, the prisoners could seek an order from the district court to resolve the dispute.

Subsequently, on April 26, 1996, Congress enacted the Prison Litigation Reform Act of 1995 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), limiting the amount of attorney's fees that can be awarded to prisoners' counsel, and thereby reducing the burden that prisoners' suits have on the public fisc. Among its restrictions on fee awards, the PLRA caps the maximum hourly rate[2] and prohibits payment of fees that are not "directly and reasonably" incurred in proving a violation of prisoners' rights.[3] *See* 42 U.S.C. § 1997e(d).

In October 1996, six months *after* the effective date of the PLRA, the district court made an award of attorney's fees for legal services performed *prior to* the enactment of the PLRA. In the following June, the district court ordered payment of fees for services performed *subsequent to* the enactment of

the PLRA. In neither case did the district court invoke the PLRA's limitations. According to the court, applying the attorney's fee provisions to a case which was pending at the time of the statute's enactment would produce a "retroactive effect," violative of "basic notions of fair notice, reasonable reliance, and settled expectations."

The prison officials have appealed both district court orders. We have jurisdiction pursuant to 28 U.S.C. § 1291.[4] Two of our sister circuits have already reached opposing conclusions on the legal question before us. The Fourth Circuit held that the PLRA's attorney's fee provisions *do* apply to pending cases, and thus to all post-enactment awards,[5] *see Alexander S. v. Boyd*, 113 F.3d 1373, 1385–88 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 880, 139 L.Ed.2d 869 (1998), whereas the Sixth Circuit concluded that they do not, *see Hadix v. Johnson*, 143 F.3d 246, 249—55 (6th Cir.1998).[6] We must now enter the thicket.

---

pending on the experience and expertise of the attorney.

**2.** Section 803(d)(3) of the PLRA provides:

> No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of Title 18, for payment of court-appointed counsel.

PLRA § 803(d)(3) (codified at 42 U.S.C. § 1997e(d)(3)). Section 3006A, in turn, provides for rates of $40, $60, and (when the Judicial Conference so provides, as it has for the Northern District of California) $75. *See* 18 U.S.C. § 3006A(d)(1). 150% of $75 is $112.50. Thus, when the PLRA applies, the maximum allowable rate is $112.50 per hour, as compared to the rates authorized by the district court, which ranged from $155 per hour to $305 per hour. The two attorneys most involved in the remedial phase of this case charged $305 per hour and $290 per hour, respectively.

The prisoners point out that the maximum rate under 21 U.S.C. § 848(q)(10) is $125.00, 150% of which is $187.50. This observation is a non sequitur. Section 803 directs us to 18 U.S.C. § 3006A, not 21 U.S.C. § 848(q)(10). Moreover, nowhere in § 3006A is § 848(q)(10) even mentioned.

**3.** Section 803(d)(1) of the PLRA provides in relevant part:

> In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are au-

thorized under [42 U.S.C. § 1988], such fees shall not be awarded, except to the extant that—

> (A) the fee was *directly and reasonably* incurred in proving an actual violation of the plaintiff's rights. . . .

PLRA § 803(d)(1) (codified as amended at 42 U.S.C. § 1997e(d)(1)) (emphasis added).

**4.** In *Gates v. Rowland*, 39 F.3d 1439, 1450 (9th Cir.1994), we held that 28 U.S.C. § 1291 conferred jurisdiction over an appeal from a periodic fee award during the remedial phase of a prisoner civil-rights case.

**5.** As discussed below, the PLRA's fee provisions, by its terms, do not apply to pre-enactment awards. *See infra* note 8.

**6.** Two other circuits, the Seventh and Eighth, have also suggested, albeit in dictum, that the PLRA's fee provisions might not reach all post-enactment awards. *See Cooper v. Casey,* 97 F.3d 914, 921 (7th Cir.1996) ("To give [the PLRA] such effect would attach ... new legal consequences to completed conduct, namely the services rendered by the plaintiffs' counsel in advance of the passage of the new Act."); *Jensen v. Clarke,* 94 F.3d 1191, 1202–03 (8th Cir.1996) ("[T]he plaintiffs and their attorneys have proceeded from the outset under the assumption that Section 1988 would apply to this case. . . . It would be 'manifestly unjust' to upset those reasonable expectations and impose new guidelines at this late date.") (quoting *Bradley v. School Bd. of Richmond,* 416 U.S. 696, 711, 94

## II

■ Recent Supreme Court decisions have outlined a three-step process for determining the temporal reach of new civil statutes. *See Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997); *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). First, a court must determine "whether Congress has expressly prescribed the statute's proper reach"; a statute can operate retroactively only with a clear statement to that effect. *Id.* at 280, 114 S.Ct. 1483. Second, in the absence of such an express command, a court must engage in a broader examination of "normal rules of construction," which requires a study of statutory canons and legislative history; these rules "may apply to remove even the possibility of retroactivity (as by rendering the statutory provision wholly inapplicable to a particular case)." *Lindh*, 521 U.S. at ——, 117 S.Ct. at 2063. Finally, if the first two steps shed no light on the temporal scope of the statute, it is necessary to fall back on a judicial default rule: Statutes are not to be applied so as to create a "retroactive effect." *Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483.

## A

■ Applying this three-part test, we must first determine whether § 803 of the PLRA, the section limiting attorney's fees, contains a clear statement on its temporal reach. If it does, then—notwithstanding any perceived unfairness—we are obliged to give

that statement its intended effect (assuming, of course, there is no constitutional violation). *See Landgraf*, 511 U.S. at 267, 114 S.Ct. 1483 ("Absent a violation of one of [the Constitution's] provisions, the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope."). To qualify as a "clear statement," the statutory provision must be unambiguous. *See id.* at 263, 114 S.Ct. 1483. As with waivers of sovereign immunity, there cannot be any "plausible" alternative interpretation of the statute.[7] *See Lindh*, 521 U.S. at —— n. 4, 117 S.Ct. at 2064 n. 4 (citing *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34–37, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992)).

■ Although this standard is a rigorous one, § 803 satisfies it. Apparently overlooked by the Sixth Circuit, *see Hadix v. Johnson*, 143 F.3d 246, 1998 WL 177343, *6 (6th Cir.1998); *Glover v. Johnson*, 138 F.3d 229, 249–50 (6th Cir.1998), the attorney's fee provisions unmistakably apply to "*any* action brought by a prisoner who is confined to any jail, prison, or other correctional facility." PLRA § 803(d)(1) (emphasis added). In *any* action, attorney's fees "shall not be awarded" unless directly and reasonably incurred in proving an actual violation; in *any* action, "[n]o award of attorney's fees" shall exceed the prescribed hourly rate. *Id.* § 803(d)(1), (3) (emphasis added). Thus, regardless of when the case was filed, § 803 applies; the statute, by its terms, targets *any* post-enactment award.[8] The text is simply not susceptible to another meaning.

---

S.Ct. 2006, 40 L.Ed.2d 476 (1974)). However, in both these cases, the fee awards at issue were made pre-enactment, not post-enactment. Moreover, the Eighth Circuit recently limited the vitality of this dictum in its jurisdiction. In *Williams v. Brimeyer*, 122 F.3d 1093 (8th Cir.1997), the court held that the fee provisions *do* apply to post-enactment awards for *post-enactment services*, and left open the possibility that the provisions might even apply to post-enactment awards for pre-enactment services. *See id.* at 1094.

7. We are not suggesting that a "clear statement" of retroactivity necessarily need be as definitive as a waiver of sovereign immunity. Indeed, statements of retroactivity might be subject to a *lower* standard: Whereas waivers of sovereign immunity may be found only in the statutory text,

*see United States v. Nordic Village, Inc.*, 503 U.S. 30, 37, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992), it appears that—for better or for worse—statements of retroactivity may be located in the text or in the legislative history, *see Landgraf*, 511 U.S. at 257–63, 114 S.Ct. 1483; *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 184, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957). This possible distinction, however, is of no consequence to the outcome of the present case, as the PLRA's plain text prescribes the temporal reach of the attorney's fee provisions.

8. We note that, because § 803 restricts only when fees "*shall ... be awarded*" and limits only the hourly rate upon which fees "*shall* be based," it does not disturb any *pre* enactment awards. PLRA § 803(d) (emphasis added); *see*

The only way to foster an alternative meaning would be to add language to what Congress has written. The attorney's fee provisions operate in "any action," not in "any action filed after the effective date."[9] We may not, and shall not, alter a statute's effect by reading into the text words which Congress chose to omit. Being judges—interpreters, not authors, of the law—we are powerless to do so. Nor can we disregard the plain meaning of the word "any." In its conventional usage, "any" means "ALL— used to indicate a maximum or whole." *Webster's Ninth New Collegiate Dictionary* 93 (1st ed.1986). It certainly does not mean "some." We find no ambiguity.

In *Lindh,* the Supreme Court acknowledged, albeit in dictum, the force of categorical language such as "all" and "any." *See Lindh,* 117 S.Ct. 2064 n. 4. Stressing the word "all"—and noting its "absolute" nature—the Court quoted the unenacted precursor to the statute addressed in *Landgraf* as an example of language that might qualify as a clear statement: "[This Act] shall apply to *all* proceedings pending on or commenced after the date of enactment of this Act." *Id.* (emphasis added in *Lindh*) (alteration in *Lindh*) (citation and internal quotation marks omitted). The Court also cited, by way of analogy, the unequivocal waiver of sovereign immunity at issue in *United States v. Williams,* 514 U.S. 527, 531–32, 115 S.Ct. 1611, 131 L.Ed.2d 608 (1995), and emphasized the word of the moment: "The district courts shall have original jurisdiction [over] ... *[a]ny* civil action against the United States for the recovery of *any* internal-revenue tax alleged to have been *erroneously* or illegally assessed or *collected." Lindh,* 521 U.S. at —— n. 4, 117 S.Ct. at 2064 n. 4 (emphasis in *Lindh* and *Williams*) (alteration in *Lindh*) (citation and internal quotation marks omitted). Section 803 uses the same absolute language. The PLRA means what it says, and nothing less.

We acknowledge that Congress could have been even more precise than it was. For example, it could have added a sentence at the end of § 803 reciting that the attorney's fee provisions "apply *both* to cases pending on and to cases commenced after the enactment date." However, the Supreme Court has never required the most emphatic possible articulation of a statement, only an unambiguous directive. Indeed, in *Landgraf,* as Justice Scalia noted with dismay, the Court was even willing to look to legislative history to find a clear statement.[10] *See Landgraf,* 511 U.S. at 287, 114 S.Ct. 1483 (Scalia, J., concurring) (citing *Landgraf,* 511 U.S. at 257–63, 114 S.Ct. 1483); *see also Automobile Club of Michigan v. Commissioner,* 353 U.S. 180, 184, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957) ("[I]t is clear from the language of the section *and its legislative history* that Congress thereby confirmed the authority of the Commissioner to correct any ruling, regulation, or Treasury decision retroactively ....") (em-

---

also *Canell v. Lightner,* 143 F.3d 1210, 1212–13 (9th Cir.1998) (focusing on tense of verbs in statute). That is, it does not affect any awards made by the district court prior to April 26, 1996. Both awards in this case, however, came after that date.

**9.** Moreover, no distinction can be drawn between post-enactment awards for *post*-enactment services and post-enactment awards for *pre*-enactment services. "By expressly stating that [§ 803] applies to an 'award' of fees Congress clearly evidenced its intent to affect a fee 'award' regardless of when legal work was completed." *Alexander S. v. Boyd,* 113 F.3d 1373, 1393 (4th Cir.1997) (Motz, J., concurring). Even the Sixth Circuit recognized that the applicability of the statute cannot turn on the timing of the work. *See Hadix,* 143 F.3d 246, 251–52 ("We do not believe the statutory language is capable of such a sophisticated construction."). Moreover, § 803 emphatically states: "*No* award of attor-

ney's fees ... shall be based on an hourly rate greater than [$112.50]." PLRA § 803(d)(3) (emphasis added). There can be only one interpretation of this word: "No" means "no." In any event, the prisoners do not even ask us to make such a distinction.

**10.** Congress very well might have relied on this aspect of *Landgraf* when it enacted the PLRA. *See Lindh,* 521 U.S. at ——, 117 S.Ct. at 2064 (noting that Congress may have looked to *Landgraf* for guidance before passing the Antiterrorism and Effective Death Penalty Act of 1996, which was part of the same appropriations bill that contained the PLRA). For this reason, irrespective of the possible benefits of adopting a "most emphatic articulation" rule, we will not do so here. *Cf. Cannon v. University of Chicago,* 441 U.S. 677, 717–18, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (Rehnquist, J., concurring) (firing warning shot to Congress before imposing specificity requirement for private right of action).

phasis added). We therefore conclude that Congress's use of the word "any" unambiguously indicates that the PLRA's attorney's fee provisions apply to all actions, irrespective of when they were filed.[11]

## B

■ Despite the unmistakable clarity of the word "any," the prisoners argue vociferously that Congress intended the attorney's fee provisions to apply only to cases filed after the enactment date. To the prisoners and their counsel, this interpretation is compelled by the canon of statutory interpretation: *expressio unius est exclusio alterius.* As applied, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (citing *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir. 1972)).

The prisoners note that § 802 of the PLRA, which concerns the availability of injunctive relief, contains a distinct retroactivity provision *not* found in § 803: "[This section] shall apply with respect to all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title." PLRA § 802(b)(1). According to the prisoners, the presence of the retroactivity provision in § 802 coupled with its absence in § 803 indicates that § 803 is to operate only prospectively. The prisoners contend that a similar negative inference largely motivated the Supreme Court in *Lindh.*

*See Lindh,* 521 U.S. at ——, 117 S.Ct. at 2067 ("We hold that the negative implication of § 107(c) is that the new provisions of chapter 153 generally apply only to cases filed after the Act became effective.").

■ The most significant flaw in the prisoners' logic is that, unlike the statute at issue in *Lindh,* § 803 contains an express statement of its temporal reach: It applies to "*any* action"; it addresses *any* post-enactment award. Although § 803 does not contain the same elaborate language as § 802, it is clear nonetheless. When a statute's terms are unambiguous, they are decisive; when the text includes an express command regarding the statute's temporal reach, there is no need to probe for a negative inference. *See Lindh,* 521 U.S. at —— – ——, 117 S.Ct. at 2062–63.

Moreover, even if § 803 lacked a clear statement as to its scope, we still could not draw the sweeping negative inference advocated by the prisoners. They simply infer too much. The retroactivity provision in § 802 is most severe; it provides that the substantive amendments in § 802 apply to all prospective relief even if "such relief was originally granted or approved" before the enactment date. PLRA § 802(b)(1). One need not infer from the absence of such far-reaching language in § 803 that the section applies only to *cases* filed after the enactment date. Rather, there is another perfectly logical inference: § 803 applies only to *awards* made after the enactment date, and not to awards that were "originally granted or approved" before that date. Indeed—we believe not coincidentally—that conclusion is precisely the one mandated by the unambiguous text of § 803.[12]

---

11. Even the Framers of the Fourteenth Amendment to our Constitution recognized the unequivocal force of the words "all" and "any":

 *All* persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No state shall make or enforce *any* law which shall abridge the privileges or immunities of citizens of the United States; nor shall *any* State deprive *any* person of life, liberty, or property, without due process of law; nor deny to *any* person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV, § 1 (emphasis added).

12. The legislative history of § 803 does nothing to shake this conclusion. The prisoners stress that the original House and Senate bills subjected what are now § 802 and § 803 to the same retroactivity clause, basically the one now found only in § 802. *See* H.R. 667, 104th Cong. § 301(g) (1995); S. 400, 104th Cong. § 2(g) (1995). According to the prisoners, the evolution of § 803 indicates that Congress wanted the statute to apply only to *cases* filed after the enactment date. However, as the *Landgraf* Court noted, it would be improper to infer so much from so little:

Contrary to the tenor of the prisoners' argument, *Lindh* did not purport to create a per se rule about negative inferences in retroactivity cases. In fact, this court has already held that, despite *Lindh*, § 802 is *not* the only provision in the PLRA that applies (as a matter of statutory interpretation) to pending cases.[13] *See Anderson v. Angelone*, 123 F.3d 1197, 1199 n. 3 (9th Cir.1997) (applying the *in forma pauperis* provisions of the PLRA to pending cases). In our view, § 803 applies as well.

### C

The clear statement prescribing the temporal reach of § 803 compels application of the attorney's fee provisions to the instant case. We nevertheless note that, even were this express command omitted from the statute, we would still hold the district court in error. The district court improperly concluded that the PLRA would have a "retroactive effect" if applied to cases pending at its enactment.

To be sure, as the district court explained, there is a strong presumption against retroactive legislation. This presumption "is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf*, 511 U.S. at 265, 114 S.Ct. 1483. However, a statute does not operate "retroactively" in the legal sense simply "because it is applied in a case arising from conduct antedating the statute's enactment." *Id.* at 269, 114 S.Ct. 1483. Nor is it enough that application of the statute would unsettle expectations or impose burdens on past conduct. *See id.* at 270, 114 S.Ct. 1483. As the *Landgraf* Court made clear, "[e]ven uncontroversially prospective statutes" might have such effects. *Id.* at 270 n. 24, 114 S.Ct. 1483. For example, "a new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property," and "a new law banning gambling harms the person who had begun to construct a casino before the law's enactment or spent his life learning to count cards"; nevertheless, we must not restrain the effect of these hypothetical statutes. *Id.* An alternative rule would forever ossify our entire legal system. *See id.* (citation omitted).

Deciding just when a statute operates "retroactively" is "not always a simple or mechanical task." *Id.* at 268, 114 S.Ct. 1483. The Court has endorsed a "functional conception[ ]," *id.* at 269, 114 S.Ct. 1483; *see also Hughes Aircraft*, —— U.S. at ——, 117 S.Ct. at 1876, under which we must ask "whether the new provision attaches *new legal consequences* to events completed before its enactment." *Landgraf*, 511 U.S. at 270, 114 S.Ct. 1483 (emphasis added). This determination depends on "the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Id.* According to the Court, "familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Id.*

The prisoners argue that the relevant past event against which "retroactive effects" are measured is the attorneys' agreement to take the case. We should consider the attorneys' expectations at that point in time, the argument goes, because as soon as counsel decided to represent the prisoners, ethical rules prohibited them from withdrawing. In California, as elsewhere, attorneys may not withdraw from ongoing litigation if doing so would materially and adversely affect the interests of the client. *See* Rules of Professional Conduct of the State Bar of California, Rule 3–700. In this case,

---

The omission of the elaborate retroactivity provision of the 1990 bill—which was by no means the only source of political controversy over that legislation—is not dispositive because it does not tell us precisely where the compromise was struck in the 1991 Act. The Legislature might, for example, have settled in 1991 on a *less expansive form of retroactivity* that, unlike the 1990 bill, did not reach cases already finally decided.

*Landgraf*, 511 U.S. at 256, 114 S.Ct. 1483 (emphasis added).

**13.** As a constitutional matter, this court recently refused to give effect to § 802. *See Taylor v. United States*, 143 F.3d 1178, 1185 (9th Cir. 1998). However, irrespective of whether this decision withstands reconsideration, it does not at all bear on our textual analysis above.

counsel's withdrawal would no doubt result in severe prejudice to the prisoners. The reasons are twofold. First, as the district court explained, "securing competent, experienced counsel willing to represent plaintiffs in prisoners' civil rights cases is a difficult venture at best." Second, any replacement would lack current counsel's unique familiarity with the facts and circumstances of the underlying constitutional violations. For these reasons, the district court concluded it "would most certainly deny, absent some extraordinary circumstance, any request to withdraw."

█ We agree with the prisoners and the district court that, because of this obligation to continue representation, the relevant past event for measuring expectations of attorney's fees in prisoner civil-rights cases is the moment when counsel agreed to take the case. It is because of this agreement, however, that we must ultimately hold that the PLRA's attorney's fee provisions do *not* have a retroactive effect. When discussing what guides a retroactivity analysis, the *Landgraf* Court did not speak about mere "notice," mere "reliance," and mere "expectations," but rather *"fair* notice, *reasonable* reliance, and *settled* expectations." *Landgraf,* 511 U.S. at 270, 114 S.Ct. 1483 (emphasis added). Although the prisoners contend that their expectations were indeed settled and their reliance was in fact reasonable, we are unable to join in this conclusion.

Any expectations were mired in uncertainty. First, the statute granting attorney's fees in civil-rights cases authorizes fees only to a "prevailing party." *See* 42 U.S.C. § 1988(b); *see also Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill."). No matter how confident the prisoners (or their counsel) had been, they could not have known when the litigation began that they would prevail. Second, not even all prevailing parties are entitled to attorney's fees. *See* 42 U.S.C. § 1988(b) (providing district courts with "discretion" to award fees). Although fees are ordinarily

granted, *see Hensley,* 461 U.S. at 429, 103 S.Ct. 1933, "[a] district court is expressly empowered to exercise discretion in determining whether an award is to be made," *Blum v. Stenson,* 465 U.S. 886, 902 n. 19, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Third, not all fee awards are the product of the prevailing market rate and the hours of service reasonably rendered. Though "strong[ly] presum[ed]" to yield a reasonable fee award, *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), this calculation is only the starting point from which district courts must consider a host of factors in determining the appropriate fee. *See Hensley,* 461 U.S. at 434–37, 103 S.Ct. 1933 (stressing significance of degree of success); *Morales v. City of San Rafael,* 96 F.3d 359, 363–64 & nn. 8–9 (9th Cir.1996) (enumerating factors to be considered); *see also Farrar v. Hobby,* 506 U.S. 103, 115, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) ("In some circumstances, even a plaintiff who formally 'prevails' under § 1988 should receive no attorney's fees at all."); *Jenkins v. Missouri,* 127 F.3d 709, 720 (8th Cir.1997) (holding that prevailing plaintiffs were entitled to only *one-half* of the requested postjudgment attorney's fees); *Harris v. McCarthy,* 790 F.2d 753, 758–59 (9th Cir.1986) (upholding district court's grant of only *11.5%* of total fee request). Fourth, at the commencement of litigation, neither the prisoners nor their attorneys could have known that the prison officials would continue to violate constitutional rights throughout the litigation and even after the district court's findings, thereby requiring a prolonged, intensive remedial phase. Without these continued violations, the attorney's fees at issue would never have accrued.

Because of these uncertainties, no expectations were settled. The prisoners and their attorneys had ephemeral hopes and nothing more. Moreover, reliance on such hopes, if in fact anyone did rely on them, was no doubt unreasonable. Finally, when one's hope is so distant, as it was in this case, being subject to a new law cannot violate any conception of "fair notice" so as to trigger retroactivity concerns.

Certainly, this hope became more realistic as the litigation proceeded. The stipulation, though not a binding contract,[14] may have assured the prisoners and their counsel that they would receive attorney's fees at the market rate for all legal services which were useful and necessary to ensure compliance. Moreover, once counsel performed the services, expectations may have grown further. However, by that point, as the prisoners themselves noted (and persuasively argued), the attorneys had already committed themselves to the litigation. Because they were locked into a course of conduct, any enhancement of expectations cannot raise retroactivity concerns. At its essence, the default rule against retroactivity is founded on "[e]lementary considerations of fairness": individuals should be able to determine what the law is and "to conform their conduct accordingly." *Landgraf,* 511 U.S. at 265, 114 S.Ct. 1483. Neither the prisoners nor their attorneys based any decisions on these growing expectations; their conduct was already prescribed by ethical rules. Therefore, by applying the PLRA, we are not frustrating any expectations that may have induced conduct.

Finally, we note that our conclusion is reinforced by, though not dependent upon, the Supreme Court's discussion of attorney's fees in *Landgraf. See Landgraf,* 511 U.S. at 276–79, 114 S.Ct. 1483. The *Landgraf* Court elaborated on a prior decision, *Bradley v. School Board of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), which applied a new attorney's fee statute to a pending case. The Court explained:

> [T]he attorney's fee provision at issue in *Bradley* did not resemble the cases in which we have invoked the presumption against statutory retroactivity. Attorney's fee determinations, we have observed, are "collateral to the main cause of action" and "uniquely separable from the cause of action to be proved at trial."

*Landgraf,* 511 U.S. at 277, 114 S.Ct. 1483 (quoting *White v. New Hampshire Dept. of Employment Sec.,* 455 U.S. 445, 451–52, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982)). We shall not break new ground today. Because applying the PLRA's fee provisions to pending cases will not result in "manifest injustice," *Bradley,* 416 U.S. at 711, 94 S.Ct. 2006, we could not, even in the absence of a clear statement, restrict the statute's scope.

Therefore, the maximum hourly rate payable for awards made after April 26, 1996, is $112.50, rather than the market rates of $155 to $305 per hour authorized in the two orders before us.

## III

The prisoners also argue that the PLRA, which limits the amount of fees paid to prisoners' counsel but not to non-prisoners' counsel, violates the equal protection component of the Fifth Amendment.

### A

 Were we to subject the PLRA's classification to strict scrutiny, we might well conclude it to be unconstitutional unless shown to be narrowly tailored to the achievement of a compelling government interest. *See, e.g., Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). We strictly scrutinize a classification, however, only if it discriminates based on a suspect criterion or impinges upon a fundamental right. *See, e.g., Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988).

 According to the prisoners, strict scrutiny is appropriate in this case because the attorney's fee limitations burden prisoners' fundamental right of access to the courts.[15] The Supreme Court has held that

---

14. As the district court noted:

> [The Court] does not construe the September 1995 stipulation to preclude application of the PLRA attorneys' fees provision in this case. Rather, ... the stipulation's reference to market rates was simply reflective of the established nature of the law and, hence, the parties' expectations, in light of that established law. The Court does not construe the stipulation as a binding agreement by the parties that a change in the law could never be applied in this case.

District Court Order, June 13, 1997.

15. The prisoners also argue that, by making it more difficult to obtain high-priced counsel, the PLRA impedes their attempts to remedy Eighth Amendment violations, thereby burdening their

this right of access requires prison authorities to provide prisoners with "the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 2182, 135 L.Ed.2d 606 (1996). Authorities must, for example, "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Prisoners possess a right of access not only to pursue appeals from criminal convictions but also to assert "civil rights actions," *Wolff v. McDonnell,* 418 U.S. 539, 579, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), such as the one brought by the prisoners at Pelican Bay to vindicate their Eighth Amendment rights.

■■■ The scope of the right of access to the courts is quite limited, however. Prisoners need only have "the minimal help necessary" to file legal claims. *Casey,* 518 U.S. 343, 116 S.Ct. at 2184. The Constitution does not even mandate "that prisoners (literate or illiterate) be able to conduct generalized research, but only that they be able to present their grievances to the courts." *Id.* Certainly, a prisoner has no fundamental right to a high-priced attorney.[16] The PLRA does not restrict access to the courts; at most, it restricts prisoners' access to the most sought-after counsel who insist on their going rate for representation.

■■■ Moreover, "an inmate cannot establish relevant actual injury simply by establishing that his ... legal assistance program is sub-par in some theoretical sense." *Id.* 518 U.S. 343, 116 S.Ct. at 2180. The prisoner must "go one step further and demonstrate that the alleged shortcomings in the ... legal assistance program hindered his

efforts to pursue a legal claim." *Id.* There has been no such showing in this case. Thus, we reject the prisoners' argument that we must subject the PLRA's attorney's fee provision to strict scrutiny.

**B**

■■■ Instead, we simply ask whether there is a rational basis for the classification. Under this minimal standard, the PLRA certainly passes constitutional muster. As the Supreme Court has made clear, "rational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Heller v. Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quoting *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). Rather, the "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

■■■ In this case, the government's interest was apparently to curtail frivolous prisoners' suits and to minimize the costs— which are borne by taxpayers—associated with those suits.[17] *See Zehner v. Trigg,* 133 F.3d 459, 463 (7th Cir.1997); *McGann v. Commissioner of Social Sec. Admin.,* 96 F.3d 28, 31 (2d Cir.1996). The prisoners do not deny that this interest is legitimate. They contend only that the interest is not rationally related to the distinction drawn between prisoners and all other litigants bringing suits against the state. However, it is certainly conceivable that, because of significant potential gains and low opportunity costs, prisoners generally file a disproportionate number of frivolous suits as compared to the

---

right to be free from cruel and unusual punishment. However, because this contention is simply a disguised reiteration of their right-of-access claim, we will not address it separately.

**16.** An alternative holding would profoundly disrupt the status of the law on the public provision of attorney's fees. Currently, even fees paid to capital defendants' counsel are capped by statute at $125 per hour, *see* 21 U.S.C. § 848(q)(10), a far cry from the rates authorized by the district

court in this case, which peaked at $305 per hour.

**17.** Congress's failure to enunciate its purpose is irrelevant. *See Heller,* 509 U.S. at 320, 113 S.Ct. 2637 ("[A] legislature that creates these categories need not 'actually articulate at any time the purpose or rationale supporting its classification.'") (quoting *Nordlinger v. Hahn,* 505 U.S. 1, 15, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)).

population as a whole.[18] Such speculation is sufficient for a rational-basis examination; there is no need for evidence or empirical data. *See Beach Communications,* 508 U.S. at 315, 113 S.Ct. 2096. Because the burden is on the prisoners "to negative every conceivable basis which might support" the legislation, *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973) (internal quotation marks omitted), and because they have not done so, their equal protection claim fails.

### IV

For the foregoing reasons, we reverse and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

**18.** It does not matter that the prisoners' suit in this case is non-frivolous. Under the rational-basis test, a court must uphold legislation "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Communications,* 508 U.S. at 313, 113 S.Ct. 2096. A court cannot overturn legislation merely because "there is an imperfect fit between means and ends." *Heller,* 509 U.S. at 321, 113 S.Ct. 2637.