UNITED STATES of America,
Plaintiff–Appellee,

v.

Aleko RRAPI, Defendant–Appellant.

Nos. 98–10081, 98–10138.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 3, 1998.

Decided May 4, 1999.

John C. Lambrose, Assistant Federal Public Defender (argued); Janet A. Bessemer, Assistant Federal Public Defender (on the briefs), Las Vegas, Nevada, for defendant-appellant.

Mathew A. Parrella, Assistant United States Attorney (argued); Camille W. Damm, Assistant United States Attorney (on the briefs), San Diego, California, for plaintiff-appellee.

Before: SCHROEDER and THOMAS, Circuit Judges, and KING,[1] District Judge.

Opinion by Judge KING; Partial Concurrence and Partial Dissent by Judge THOMAS. `

1. The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

KING, District Judge:

## INTRODUCTION

In these consolidated appeals, Defendant Aleko Rrapi ("Defendant" or "Rrapi") appeals (1) a judgment of conviction of one count of bank robbery in violation of 18 U.S.C. § 2113(a) and 2 (aiding and abetting); and (2) a finding of criminal contempt in violation of 18 U.S.C. § 401(1). We have jurisdiction under 28 U.S.C. § 1291, and affirm.

## BACKGROUND

On March 5, 1997, Defendant Aleko Rrapi, along with co-defendants Thomas Paskali and Petrit Dindi, were charged in a one-count superseding indictment for Bank Robbery based upon an attempted entry into a U.S. Bank automated teller machine ("ATM") during a break-in of an Albertson's supermarket in Las Vegas, Nevada. Paskali and Dindi pled guilty; Dindi testified as a cooperating witness against Rrapi.

The FBI had been investigating all three Defendants for several months. The FBI surveillance operation included the use of electronic "bugs" of Defendants' apartment. Agents had stationed themselves in the apartment directly below the Defendants' apartment. The Defendants were suspected of several break-ins of ATM's throughout Las Vegas and California, as well as robberies of other stores and restaurants. According to the FBI, the Defendants' modus operandi included a practice of "normally [making] a hole in the ceiling and the roof of banks and other grocery stores" for entry.

On the evening of December 25, 1996, a shift of FBI agents began their surveillance of Defendants' apartment. Rrapi's orange BMW, as well as Paskali's vehicle, were missing. Thus, the agents began searching several areas in Las Vegas that the Defendants were known to frequent.

Defendants were at a local casino; Rrapi drove Dindi in his orange BMW and Paskali drove in a different car. Dindi testi-fied that after they finished drinking and gambling, they left the casino looking for a store to break into for money. They targeted the Albertson's grocery store, which contained an ATM machine. Rrapi parked his car at a video store next door, and left Dindi to watch for police. Rrapi and Paskali went into the Albertson's. Rrapi returned about an hour later, empty-handed.

Albertson's grocery stockers discovered the break-in as it was occurring between 10:00 and 11:00 p.m. The intruders had escaped through the back door. The stockers found a damaged ATM machine. Someone had pried the front and top covers of the ATM off; had cut the hinges; and had inserted a screwdriver in the machine. A Marlboro cigarette butt and shoe print were found, as well as a pillowcase containing a nylon rope. Intruders had pounded a hole through the store's roof, presumably the point of entry.

The FBI agents who had been looking for Defendants responded to the Albertson's scene, after having been notified by metropolitan police. One agent went back to the Defendants' apartment. He then saw Rrapi pull up in his BMW. Based upon conversations inside the apartment, agents searched the area around Albertson's for Paskali's car. They found his car, which had a pack of Marlboro cigarettes in the front seat. Paskali had apparently walked back to the apartment, after escaping the Albertson's. Early the next morning, Dindi and Rrapi went back to pick-up Paskali's car.

On February 17, 1997, the FBI searched Defendants' apartment. The FBI found burglary tools, a power grinder of a type able to cut ATM hinges, wirecutters, a saw blade, a shoe matching the Albertson's print, and a pillowcase matching the Albertson's pillowcase. Rrapi's BMW contained screwdrivers, a crowbar, a grinding wheel, wire cutters, and "a splitting wedger."

In January of 1998, Rrapi was tried for bank robbery under 18 U.S.C. §§ 2113(a)

and 2. Much is made in this appeal of the transcribing and translating (Rrapi, Paskali and Dindi are Albanian) of the surveillance tapes, which were apparently of poor quality. Prior to trial, the court conducted an "audibility hearing" regarding three of the tapes. After a four-day trial, Rrapi was convicted. He was sentenced to 27 months in custody, restitution, and three years supervised release.

As the jury was announcing its verdict, Rrapi swore directly at the jurors and possibly at the prosecutor. After one outburst, the Marshal appears to have handcuffed, or prepared to handcuff, Rrapi (he told Rrapi "put your hands behind your back" after an incident). The government asked the court to find Rrapi in contempt. The trial court, after a hearing that afternoon, found him in criminal contempt under 18 U.S.C. § 401(1), entered a written order, and sentenced him to serve the next 60 days in custody without being credited with time served.

Rrapi appeals both his bank robbery conviction and the criminal contempt finding and sentence.

## DISCUSSION

1. **The trial court did not abuse its discretion in admitting the tape excerpts and translated transcript.**

■ Rrapi asserts that the trial court erred in allowing the jury (1) to hear the tape (primarily in Albanian) of the FBI's surveillance from December 25, 1996, and (2) to read the FBI's corresponding translation. He contends that the tape was not audible,. and that the court should have allowed his expert witness translator (Ms. Romano) to listen to the tape on the court's equipment in order to challenge the accuracy of the FBI translation. He claims the court should not have admitted the translated transcript into evidence.

■ "Where there is no dispute as to accuracy, we review for abuse of discretion the district court's decision to allow the use of wiretap transcripts during trial[.]" *United States v. Pena–Espinoza*, 47 F.3d 356, 359 (9th Cir.1995) (citing *United States v. Taghipour*, 964 F.2d 908, 910 (9th Cir.1992)).[2] "The use of transcripts as an aid in listening to tape recordings is reviewed for abuse of discretion." *United States v. Armijo*, 5 F.3d 1229, 1234 (9th Cir.1993) (citing *Taghipour*).

■ "A recorded conversation is generally admissible unless the unintelligible portions are so substantial that the recording as a whole is untrustworthy" *United States v. Tisor*, 96 F.3d 370, 376 (9th Cir. 1996) (quoting *United States v. Lane*, 514 F.2d 22, 27 (9th Cir.1975)).

■ Generally, the Court reviews the following steps taken to ensure the accuracy of the transcripts: (1) whether the court reviewed the transcripts for accuracy, (2) whether defense counsel was allowed to highlight alleged inaccuracies and to introduce alternative versions, (3) whether the jury was instructed that the tape, rather than the transcript, was evidence, and (4) whether the jury was allowed to compare the transcript to the tape and hear counsel's arguments as to the meaning of the conversations. *See Armijo*, 5 F.3d at 1234.

The third factor (instruction that the tape, not the transcript, is evidence) does not apply with foreign language tapes. *See United States v. Fuentes–Montijo*, 68 F.3d 352, 355 (9th Cir.1995) ("when faced with a taped conversation in a language other than English and a disputed English translation transcript, the usual admonition that the tape is the evidence and the transcript only a guide is not only nonsensical, it has the potential for harm").

2. Defendant suggests that the standard of review should be de novo because he was not given an opportunity to challenge the accuracy of the transcripts. He relies on language in *Pena–Espinoza*, 47 F.3d at 359, discussing a defendant's failure to challenge the accuracy of transcripts. We need not decide whether to adopt a less deferential standard of review here, because even under a de novo standard, there would be no error.

Defendant makes much of the fact that the court refused to allow his expert additional time (after the court ruled on the admissibility of the tape and transcript) to listen to the excerpt on the court or FBI's tape player. He claims he was unable to challenge the accuracy of the transcript. What is important, however, is that ultimately only a short excerpt was admitted. The court substantially granted Defendant's request, based upon audibility, to exclude most of the transcripts. The Defendant's expert had also translated the admitted portion, and her translation was substantially similar to the government's transcript. The court allowed Defendant's expert to testify as to audibility before the jury (although she apparently did not testify). Defendant cross-examined the FBI translator for bias regarding whether he could understand the tape, and whether he could actually decipher Rrapi's voice in it. He also argued to the jury that the tapes were not audible, and that Rrapi's voice was not on it.[3] Given these circumstances, we cannot say that the trial court abused its discretion in admitting the tape and transcript.

As indicated, the government sought to introduce excerpts of three tapes and the corresponding translations. The court admitted only one of the three (a four or five minute portion from December 25, 1996). The entire tape (a 90 minute cassette), a copy with only the excerpt, and a transcript of the translation were given to the jury. The tape was played for the jurors, who followed along using the transcript.

The FBI translator (Mr. Neza) who was involved in the surveillance operation and who prepared the translations, testified at a pre-trial audibility hearing that he spent "about thirty hours" listening to, translating, and preparing transcripts of the three portions. Although the tape was difficult to understand, Neza estimated he was ulti-mately able to understand about 75 to 80 percent of the conversations on the tapes. Defendant's expert (Ms. Romano), however, disputed the audibility of the tapes. She estimated that she could only decipher about 10 to 20 percent of the tape that was eventually admitted.

At the audibility hearing, after considering testimony of both Neza and Romano, and listening to portions of the tapes, the court indicated that its "inclination [was] to keep them out." He was "impressed with both of the translators." He was concerned about the sound quality, although he noted that the gist of the translations of the December 25, 1996 excerpt were similar. The court excluded the other two tapes, and indicated it would focus on whether the December 25, 1996 tape was audible.

After the hearing, the court took the two transcripts (Neza's and Romano's) and the tape for further study that night. The next morning, he indicated he had listened to the tapes with headsets in a quiet room. He determined that the December 25, 1996 tape was "clearly audible" even though he didn't speak Albanian. After lengthy discussions with Ms. Romano, the court ruled that the tape would be admissible, subject to proper foundation. As for the translation, he reasoned that "the tape means nothing without the translation, and the evidence that is received is the tape, but the jury will be permitted to review the English translation."

Defendant argues that the judge could not have determined audibility because he did not speak Albanian. There is a distinction, however, between audibility and understanding. The judge could certainly determine whether the tape was of sufficient quality and clarity in terms of sounds to allow the jury to assess whether the FBI agent could have translated the tape. Judge George did more than necessary in

---

3. During closing, Defense counsel argued:
 You [the jury] listened to the clarity of those tapes .... could you have made out a voice on that tape? Take the tape back with you to the jury room ... Listen to it, ... if you can't distinguish voices, I submit to you that whether or not Mr. Neza is an expert in Albanian, he can't distinguish either.

listening to the tape on his own, rather than relying solely on the translators' conflicting opinions, to determine whether the tape was of sufficient clarity to allow a jury to hear it.

The court also gave the following jury instruction, which was agreed upon by the Defendant:

> You have been provided or—and have reviewed and will be made available to you a document prepared by the government which reflects the government's translation of that taped conversation which occurred on December 25th, 1996. The government's translator has been qualified as an expert in the Albanian language and therefore is subject to the terms of the next instruction.... It is up to the jury to determine, based upon the evidence presented to you, whether the translation is an accurate representation of what was actually said.

> You have heard testimony from a person described as an expert.... Expert opinion testimony should be judged just like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

The court properly applied the relevant factors from *Armijo* in admitting the tape. The court held a detailed hearing; it reviewed the transcripts for accuracy; it allowed defense counsel to highlight alleged inaccuracies and to introduce alternative versions; it instructed the jury appropriately regarding the transcript;[4] and allowed counsel to present its own expert, cross-examine the FBI translator, and argue the meaning of the conversations. *See Armijo,* 5 F.3d at 1234. Accordingly, the trial court did not err in admitting the tape and transcript.

**2. The trial court properly admitted the Rule 404(b) evidence.**

■■■ Defendant asserts that the trial court improperly admitted evidence of prior bad acts. The Court reviews for abuse of discretion the trial court's decision to admit Rule 404(b) evidence, but considers de novo whether evidence is directly relevant to the crime charged or relevant only to "other crimes." *See United States v. Jackson,* 84 F.3d 1154, 1158–59 (9th Cir. 1996). Whether evidence falls within the scope of Rule 404(b) is reviewed de novo. *See United States v. Arambula–Ruiz,* 987 F.2d 599, 602 (9th Cir.1993) (citation omitted).

■■ Fed.R.Evid. 404(b) provides in part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

"Rule 404(b) 'is a rule of inclusion'" *Jackson,* 84 F.3d at 1159 (citation omitted). "Unless the evidence of other crimes tends only to prove propensity, it is admissible." *Id.*

■■■ Evidence of prior bad acts may be admitted "for the purpose of providing the context in which the charged crime occurred." *United States v. Collins,* 90 F.3d 1420, 1428 (9th Cir.1996). Evidence of other acts that is "inextricably intertwined" with the underlying offense is admissible under Rule 404(b). *See United States v. Warren,* 25 F.3d 890, 895 (9th Cir.1994). Evidence is "inextricably intertwined" if it "constitutes a part of the transaction that serves as a basis for the criminal charge," *United States v. Vizcarra–Martinez,* 66 F.3d 1006, 1012–13 (9th

---

**4.** Defendant argues that the court did not instruct the jury that the tape—not the transcript—is the evidence, as *Armijo* states.

However, because the tape was in a foreign language, the court was not supposed to do so. *See Fuentes–Montijo,* 68 F.3d at 355–56.

Cir.1995), or "was necessary to ... permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Id.*

■ In allowing Rule 404(b) evidence, a district court is not required to recite the corresponding Rule 403 balancing analysis for the record. *See Jackson,* 84 F.3d at 1159. "It is enough that this court can conclude, based on a review of the record, that the district court considered Rule 403's requirements." *Id.* (quoting *United States v. Ono,* 918 F.2d 1462, 1465 (9th Cir.1990)).

Applying these principles, the trial court committed no error in allowing the evidence of other acts. The primary bad acts evidence dealt with Defendant's previous participation in other (uncharged) attempted and successful burglaries. The government had evidence that Defendant participated in a burglary of Trader Joe's Market on October 24, 1996; other burglaries in California in the summer of 1996; a bank burglary of an ATM machine at a Bank of America in California on July 5, 1996; an attempted burglary of a restaurant in January of 1997 and of a laundromat in February of 1997 (after the incident in question).[5] This evidence was apparently obtained in connection with (or led to) the several-month investigation and surveillance of Defendants' activities.

Not all of these incidents or the details of them were admitted into evidence. The Rule 404(b) request was limited to three categories. First, Dindi testified at trial generally about the Defendants' previous restaurant or bank break-ins. Second, Dindi testified about buying a power grinder (to break into a safe) at a Trader Joe's market to commit another burglary. Before Dindi testified about these other crimes, the trial court gave a contemporaneous and explicit Rule 404(b) limiting instruction.[6] (The third was the videotape which was excluded.)

The trial court did not specifically rule that the evidence was not Rule 404(b) evidence, although the judge indicated that he thought it was "inextricably intertwined." The court ruled that

> ... I'm not sure that much of what was suggested is 404(b) evidence to start with. I think that it probably does include activities so involved that it's part of the entire process, and under that theory it could come in and even a conspiratorial idea.
>
> I will give a limiting instruction. Notwithstanding, I'm not persuaded that all the evidence that's been discussed is 404(b) evidence, but it will come in with the exception of the—until the more specificity is given as to the other break-ins and where those break-ins were.

■ Essentially, then, the court erred on the side of caution. Although Judge George thought the evidence was admissible to show context or was "inextricably intertwined" with the charged crime, he gave a limiting instruction anyway. There is nothing wrong with such an alternative ruling. *See, e.g., United States v. Santiago,* 46 F.3d 885, 888–90 (9th Cir.1995) (evaluating Rule 404(b) question on alternative grounds).

**5.** The government also had a videotape of an attempted break-in at the Scandia Family Fun Center. After reviewing the tape and hearing the testimony of agent Schlumpf outside the jury's presence, the trial court excluded the Scandia videotape.

**6.** He told the jury:
 I'm going to give you what is called a limiting instruction. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action and conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. And some of the evidence that will be forthcoming may fall within this area, and you should limit your use of that evidence for these purposes that I've identified.
He also gave a shorter instruction as part of the final instructions.

■ The evidence that was admitted, especially Dindi's testimony, appears to fit precisely into a Rule 404(b) exception. It demonstrated plan, preparation, and intent. Dindi testified about how he, Paskali, Rrapi, and another man, would plan and carry out or discuss previous burglaries. These burglaries involved using crowbars and climbing on the roof; an accomplice waited outside, while someone would break into safes. This pattern was similar to that used in the Albertson's Christmas incident. The incidents were also relatively near in time to the incident in question.

At least some of the evidence also indeed appears to be "inextricably intertwined" with the charged conduct. Dindi testified that on Christmas, he, Paskali and Rrapi drove around looking for a restaurant to break into (in the same pattern as with previous burglaries). The evidence enabled the "prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Vizcarra–Martinez*, 66 F.3d at 1012–13. It gave the "context in which the charged crime occurred." *Collins*, 90 F.3d at 1428.

■ Further, the evidence also could have been admissible under Fed.R.Evid. 801(d)(2)(E) (admissible as statement by a coconspirator of a party during the course and in furtherance of the conspiracy). Judge George recognized this when he stated "even though this isn't a conspiracy case, the concept of conspiracy would apply in terms of 801(d)(2)(E)." The court made a specific finding that a conspiracy was established for Rule 801(d)(2)(E) purposes. He made a finding that "for the record, I mentioned to you, I think under the law that for purposes of 801(d)(2)(E) that conspiracy has been established."

Moreover, the court *excluded* some of the proffered evidence. As indicated earlier, the court refused to admit the videotape of the Scandia center break-in "because it raise[d] too many collateral issues." The court held a long Rule 404(b) hearing, where the parties argued their respective positions (including Defense attorney's arguments under Rule 403 for the proper balancing).[7]

Thus, the "other bad acts" evidence was properly admissible on alternate grounds. Even if it was not inextricably intertwined, the court gave a Rule 404(b) limiting instruction and performed a Rule 403 balancing test. The evidence was also admissible under Rule 801(d)(2)(E). The court properly admitted the evidence.

### 3. Ample Evidence Supports the Conviction.

■ Next, Defendant argues that there was insufficient evidence to convict, and that the court should have granted his motion for judgment of acquittal. This argument lacks merit.

■ There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See, e.g., United States v. Ross*, 123 F.3d 1181, 1184 (9th Cir.1997), *cert. denied*, ―― U.S. ――, 118 S.Ct. 733, 139 L.Ed.2d 670 (1998).

Here, co-defendant Dindi testified that Rrapi agreed to and participated in the

---

7. Defendant argues that the court did not make the proper Rule 403 analysis. The record, however, belies this argument:

> Mr. French: ... Your honor, I would also like to note that when making—when the Court makes a 404(b) determination, it looks—it must look to 403, as well, the prejudicial versus—
> The Court: Well, sure. The balance of—
> Mr. French: And balancing the test.

> The Court:—prejudice versus—
> Mr. French: And here, obviously, the prejudicial effect is great....
> The Court: The balance is the probative value versus—
> Mr. French: Versus the prejudicial.
> The Court:—undue prejudice. There's always going to be some prejudice.

Accordingly, we reject Defendant's argument regarding the lack of a Rule 403 analysis. *See Jackson*, 84 F.3d at 1159.

charged crime. Dindi testified that Rrapi drove him (with co-defendant Paskali in another car) "all over Las Vegas" looking for a restaurant or business to break into. After they arrived at the Albertson's, Rrapi and Paskali left on foot for the Albertson's and Rrapi told Dindi to wait and look for police. After about an hour Rrapi returned with no money and told Dindi that "people came in at Albertson's." In addition to this direct testimony, Rrapi's orange BMW was seen by others outside the Albertson's. The FBI translator identified Rrapi's voice discussing the crime on December 25, 1996. Tools such as screwdrivers, a crowbar, a grinding wheel, and wire cutters were recovered from Rrapi's BMW. Construed in favor of the government, ample evidence supports a conviction. *See Ross*, 123 F.3d at 1184.

### 4. The Albertson's was used "in part" as a bank insured by the FDIC.

 Rrapi contends that the government failed to prove that the Albertson's "functioned as a 'bank' on the day of the burglary." We disagree.

18 U.S.C. § 2113(a) provides in part:

. . . .

Whoever **enters or attempts to enter** any bank, ... or any **building** used in whole or **in part** as a bank, ... with intent to commit in such bank, ... or **building, or part thereof**, so used, any felony **affecting** such bank ... and in violation of any statute of the United States, **or any larceny—**

Shall be fined under this title or imprisoned not more than twenty years, or both. (Bold emphasis added).

"Bank" is defined in part as:

... any institution the deposits of which are insured by the Federal Deposit Insurance Corporation.

18 U.S.C. § 2113(f).

The government satisfied the elements of a robbery, or attempted robbery, under Section 2113(a). The Albertson's market was a "building" used "in part" as a "bank." Evidence indicated an "intent" to commit inside the "building" a felony (or larceny) "affecting" an institution (U.S. Bank) with federally-insured deposits. The Nevada security manager for U.S. Bank testified that (1) U.S. Bank's funds at all ATM's in Las Vegas are insured by the FDIC; (2) U.S. Bank manages, funds, and possesses the ATM at Albertson's; (3) U.S. Bank had to replace the ATM after it suffered damages of $3,100; and (4) the ATM contained $27,720 of U.S. Bank funds on December 25, 1996.

Nevertheless, Rrapi argues that there is authority contrary to our holding that a "building" such as a market is used "in part" as a "bank" if contains an ATM machine managed, funded, and possessed by a federally-insured banking institution and containing federally-insured funds. Defendant cites to *United States v. Willis*, 102 F.3d 1078, 1081 n. 2 (10th Cir.1996). *Willis* involved defendants who attempted to remove an ATM machine from a shopping mall. In *Willis*, the defendants were charged with conspiracy to commit "bank larceny" under 18 U.S.C. § 2113(b)—contrasted with Section 2113(a) at issue in this case. Section 2113(b) federalizes the stealing of "property or money or any other thing of value exceeding $1,000" that belongs to or is in the custody, control, or possession of "a bank." In a footnote, the Tenth Circuit in *Willis* commented that the "government could not indict defendant under § 2113(a) because there was ... no entry or attempted entry of a bank." *Id.* at 1081 n. 2. This language, however, is dicta. The Tenth Circuit was not presented with any issue under Section 2113(a) and did not analyze the language of the statute.

Even if the government in the instant case could have indicted the Defendants for attempted bank larceny under Section 2113(b), or conspiracy to commit bank larceny under 2113(b), this does not mean that Section 2113(a) was not satisfied. That is, even if the activity charged here

might also fit into a Section 2113(b) offense, it still fits under Section 2113(a).

 Defendant also argues that Congress could not have foreseen the widespread use of ATM machines outside of traditional "banks" when Congress enacted the bank robbery statutes. Therefore, Defendant suggests that, under a policy of "lenity," burglarizing a market (even if the target was federally-insured money) should not be considered bank robbery under Section 2113(a). *See, e.g., Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1979) (stating that "policy of lenity means that the Court will not interpret a federal statute so as to increase the penalty it places on an individual when such an interpretation can be no more than a guess as to what Congress intended"). Nevertheless, "the 'touchstone' of the rule of lenity 'is statutory ambiguity.'" *Albernaz v. United States,* 450 U.S. 333, 342, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981) (quoting *Bifulco*). "Lenity thus serves only as an aid for resolving an ambiguity; it is not to be used to beget one." *Id.* In this instance, the statute is unambiguous.[8]

We do not believe this reading of the statute turns grocery stores into banks. The dissent is of course correct that the entire Albertson's supermarket is not a bank. Section 2113(a), however, requires only that a building be used "in part" as a bank. The dissent further argues that the building is not even partly a bank, because off-premises ATMs are not banks according to civil law banking statutes. Under the language of Section 2113(a), however, we need not find that an ATM itself is a bank, but only that a part of any building is used as a bank. Customers in Albertson's use the ATM to withdraw, deposit, and transfer federally insured funds—some of the most important functions of a

bank from a customer's perspective. The U.S. Bank uses the ATM to store cash—the most important function of the bank from a robber's perspective. The Albertson's building was thus "used ... in part as a bank."

We note that, for purposes of the McFadden Act, an ATM is not considered a "branch" of a bank. *See* 12 U.S.C. § 36(j) (Supp.1998) (as amended in 1996). The McFadden Act, however, defines a "branch" of a bank for purposes of protecting "competitive equality" of branch banking between state and federal banking institutions. *See, e.g., First National Bank in Plant City, Florida v. Dickinson,* 396 U.S. 122, 136, 90 S.Ct. 337, 24 L.Ed.2d 312 (1970). If ATMs were considered to be "branch banks" for purposes of the McFadden Act, this would presumably interfere with "competitive equality" in national banking and therefore interfere with the purposes of the McFadden Act. *Cf. Independent Bankers Association of New York State, Inc. v. Marine Midland Bank, N.A.,* 757 F.2d 453, 460–61 (2d Cir.1985). The definition in Section 36(j) has little, if any, bearing on the definition of a "bank" for purposes of the federal bank robbery laws. Rather, for such purposes, a "bank" is defined, in part, as "any institution the deposits of which are insured by the Federal Deposit Insurance Corporation." 18 U.S.C. § 2113(f).[9] There is no dispute that the U.S. Bank funds at issue here were federally insured. And, again, we are concerned here with whether the Albertson's was used "in part" as a bank.

Similarly, in Pub.L. 104–208, § 2205(b) (1996) Congress, inter alia, excluded an ATM from the definition of "domestic branch" of a bank in 12 U.S.C. § 1813(o). Despite the amendments regarding ATM machines to Sections 1813(o) and 36(j),

---

8. Moreover, Defendant's logic could just as easily apply to Section 2113(b) as well; if we were to adopt his argument, he could not be prosecuted under either Section (a) or (b).

9. Section 2113(f) also refers to the definition of a "bank" in 12 U.S.C. § 3101, which in turn refers to the definition in 12 U.S.C. § 1841. Thus, the definition in Section 1841 is relevant in determining the meaning in Section 2113(f).

Congress did not include ATM machines among the many *exclusions* from the definition of a "bank" in 12 U.S.C. § 1841(c)(2). This omission further supports our holding that, under the facts of this case, the building containing the ATM was used, in part, as a "bank" for purposes of 18 U.S.C. § 2113. *See, e.g., Madrid v. Gomez,* 150 F.3d 1030, 1037 (9th Cir.1998) (describing canon of "expressio unius est exclusio alterius"). Surely, the government has proven that (1) U.S. Bank's deposits are insured by the FDIC; (2) the Albertson's building was used "in part" by, and as, an institution with federally-insured deposits; and (3) the attempted robbery of the ATM machine "affected" U.S. Bank. The government has proven the necessary elements under Section 2113(a).

### 5. Sufficient evidence supports the contempt charge.

■ In Appeal No. 98–10081, Rrapi appeals the finding of criminal contempt under 18 U.S.C. § 401(1) and Fed.R.Crim.P. 42, based upon his misbehavior after the verdict was read. We affirm the contempt conviction.

■ The district court's decision to invoke summary contempt procedures, including its consideration of the need for immediate action, is reviewed for an abuse of discretion. *See United States v. Engstrom,* 16 F.3d 1006, 1009 (9th Cir.1994). There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See, e.g., United States v. Ross,* 123 F.3d 1181, 1184 (9th Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 733, 139 L.Ed.2d 670 (1998).

Title 18 U.S.C. § 401(1) provides:

A court of the United States shall have the power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

Fed.R.Crim.P. 42 provides in part:

(a) Summary Disposition. A criminal contempt may be punished summarily if the judge certifies that the judge saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

(b) Disposition Upon Notice and Hearing. A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice.

■ The elements of criminal contempt under Section 401(1) are (1) misbehavior in the court's presence, and (2) obstruction in the administration of justice. Additionally, the misbehavior must be willful. *See In re Gustafson,* 650 F.2d 1017, 1020 (9th Cir.1981).

Construing the evidence in favor of the government, Defendant's behavior was undoubtedly "misbehavior in the court's presence." Moreover, upon review of the transcript, it constituted "obstruction in the administration of justice." It is significant that the comments ("F* * * you, mother f* * *er") could have been directed at a specific juror. Moreover, the comments came after the verdict was read, but *before* the jurors were polled. Conceivably, depending upon whether the tone was deemed to be threatening, jurors could have changed their vote in response to the outburst. The transcript reflects the following:

The Clerk:

. . .

We, the jury in the above-entitled case upon our oaths do say that:

We find the defendant Aleko Rrapi guilty of the offense charged in Count 1 of the indictment herein.

Dated this 8th day of January, 1998, [M.C.] foreperson.

The Court: Okay, thank you.

The Clerk: Juror Number 1—

The Defendant: F* * * you, mother f* * *er.

Ms. Kaufman:. Shh. Just sit down.

The Court: Please—please be seated.

The Clerk: Juror Number 1, is this your true verdict? Mr. [G.]?

Juror No. 1: Yes, it is.

. . . .

The Clerk: Juror Number 4?

Juror No. 4: Yes.

(Defendant Colloquy)

. . . .

The Clerk: Juror Number 12?

Juror No. 12: Yes.

(Defendant Colloquy)

The Court: Okay. Thank you. •

. . . .

The Court:—no one heard any threats, I take it?

Mr. Clark: Well, Your Honor, I'd consider that to be a threat, to look at the jury and call them those names.

. . . .

Ms. Kaufman: I don't know that calling someone a name is a threat, I think—

(Defendant Colloquy)

Ms. Kaufman: Excuse me.

U.S. Marshal: Put your hands behind your back.

Mr. Clark: Well, it's certainly contemptuous conduct, Your Honor, and I ask the Court to—have an order to show cause hearing.

The Court: Yeah, he can be removed from the courtroom forthwith.

U.S. Marshal: Thank you your honor.

Although the "defendant colloquies" were not transcribed (or translated, if they were not in English), the trial court could have determined that Rrapi's conduct was threatening, especially to the jurors. Further, agent Schlumpf testified that some jurors were "intimidated" and "wanted to be assured that he was going to be in jail."

In this context, causing jury intimidation constitutes "interfering with the administration of justice" for purposes of the contempt statutes.

As for willfulness, Rrapi argues that he is an Albanian who utilized a translator throughout the trial, and who is ignorant of American trial procedures. The trial judge here, however, was in a position to determine culpability. He observed Defendant's demeanor, behavior, and the context in which the remarks (or threats) occurred—observations unavailable to us in an appellate posture reviewing a cold record. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of criminal contempt beyond a reasonable doubt. *See, e.g., Ross,* 123 F.3d at 1184. The finding of contempt is affirmed.

## CONCLUSION

For the foregoing reasons, we AFFIRM both the bank robbery and criminal contempt convictions.

THOMAS, Circuit Judge, concurring in part and dissenting in part:

I agree with most of the majority opinion. However, I respectfully dissent from the conclusion that an automated teller machine located in a grocery store constitutes a "bank" for the purposes of the Federal Bank Robbery Act.

A little more than a decade before automotive bank heists would cause Congress to federalize the crime of bank robbery, the Supreme Court described a common understanding of a "bank" that rings true even today: "Speaking generally, a bank is a moneyed institution to facilitate the borrowing, lending and caring for money." *Smith v. Kansas City Title & Trust Co.,* 255 U.S. 180, 210, 41 S.Ct. 243, 65 L.Ed. 577 (1921).

Since then, the banking industry has continued an institution-based concept of a bank, generally defining one as "a quasi

public institution, for the custody and loan of money, the exchange and transmission of the same by means of bills and drafts, and the issuance of its own promissory notes, payable to bearer, as currency, or for the exercise of one or more of these functions." 1A *Michie on Banks and Banking* § 2, at 5–6 (1993).

Federal and state statutory schemes governing the banking industry also maintain institutionally-based definitions. *See, e.g.,* 12 U.S.C. § 1841(c). Without digressing to a discussion of the Glass–Steagall Banking Act of 1933 or an exhaustive survey of laws pertaining to financial institutions, it suffices to say that Congress has been quite careful to define what a bank is, and what it is not. Particularly in its treatment of branch banking, Congress has been especially clear to declare that off-premises ATMs are not banks. For example, in defining a "domestic branch" of a bank, Congress specifically provided that "[t]he term 'domestic branch' does not include an automated teller machine or a remote service unit." 12 U.S.C. § 1813(*o*). The banking statutes pertaining to the availability of expedited funds refer to a "proprietary ATM" as being at, adjacent to, or in close proximity of, a receiving depository institution. 12 U.S.C. § 4001(16). All other ATMs are, under the statute, "nonproprietary ATMs." *Id.* § 4001(18).

The regulatory distinction between banks and ATMs is logical and critical. In their ordinary use, automated teller machines are not merely proprietary mechanical or electronic extensions of a bank. Rather, an ATM usually functions as a gateway to a shared ATM network in which account holders may use their own bank's ATM card to withdraw cash from another bank's owned ATM. *See Valley Bank of Nevada v. Plus Sys., Inc.,* 914 F.2d 1186, 1188 (9th Cir.1990). Through shared ATM networks, banks subscribe to uniform reimbursement practices which allow remote site transactions made on ATMs owned by other banks. *Id.* Thus,

although an ATM may be owned by an individual bank, it functions quite differently, serving as a deposit and withdrawal conduit to numerous financial institutions.

The specific statute at issue, the Federal Bank Robbery Act, is consistent with this regulatory backdrop. In statutory interpretation, one must begin with specific words employed, for if the language of a statute is unambiguous, its plain meaning controls. *United States v. Robinson,* 94 F.3d 1325, 1328 (9th Cir.1996). The relevant provision of the Federal Bank Robbery Act, 18 U.S.C. § 2113(f) defines a "bank" as:

> any member bank of the Federal Reserve System, and any bank, banking association, trust company, savings bank, or other banking institution organized or operating under the laws of the United States, ... and any institution the deposits of which are insured by the Federal Deposit Insurance Corporation.

ATMs are not members of the Federal Reserve System; they are not organized under the laws of the United States; and they are not "institutions" the deposits of which are insured by the Federal Deposit Insurance Corporation. Thus, from a plain reading of the statute, off-premises ATMs are not within the Act's reach. If Congress had intended the federal crime of bank robbery to include off-premises assets, or to encompass robberies in shopping malls, airports, or grocery stores, it could have stated so specifically.

One of the cardinal principles of criminal law is notice. "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939). On its face, the Federal Bank Robbery Act does not apply to off-premises machines which dispense cash. A creative interpretation of the Act that would transform grocery stores into banks because of the presence of a cash machine would not afford sufficient notice of the criminal activity to survive constitu-

tional muster. Thus, I agree with the Tenth Circuit's view, albeit in dicta, that attempting to steal from an off-premises ATM does not constitute a sustainable violation of 18 U.S.C. § 2113(a). *United States v. Willis,* 102 F.3d 1078, 1081 n. 2 (10th Cir.1996).

In this case, federal prosecutors had the option of proceeding under other well-defined federal statutes, deferring to local law enforcement, or attempting to expand the reach of the federal bank robbery statutes. They chose the last, a choice I believe unjustified by statute or the principles of federalism. Chief Justice Rehnquist has recently cautioned against expanding federal jurisdiction by federalizing crimes traditionally handled by state courts. *See* William H. Rehnquist, *The 1998 Year–End Report of the Federal Judiciary* 4 (1998). As the Chief Justice appropriately noted:

> Federal courts were not created to adjudicate local crimes, no matter how sensational or heinous the crimes may be. State courts do, can, and should handle such problems.

*Id.*

The extension of the Federal Bank Robbery Act to include off-premises ATMs constitutes an unwarranted and unnecessary judicial federalization of burglary-a crime well within the expertise of local law enforcement and state courts. *See generally* American Bar Association Task Force on Federalization of Criminal Law, *The Federalization of Criminal Law* (1998).

In sum, at least in this stage of our history, machines are not banks. Accordingly, unless Congress dictates otherwise, prosecution of those who burglarize grocery stores should be left to the states. Thus, although I concur in the contempt conviction and all but part 4 of the majority opinion, I would reverse the conviction for violation of the Federal Bank Robbery Act.