**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Daniel Gilbert BROWN, Defendant–**
**Appellant.**

No. 01–30261.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 5, 2002.

Filed April 25, 2003.

---

James A. Wendt, Anchorage, AK, for the defendant-appellant.

Adam G. Ciongoli, Washington, DC, for the plaintiff-appellee.

Before B. FLETCHER, ALARCÓN, and GRABER, Circuit Judges.

## OPINION

BETTY B. FLETCHER, Circuit Judge.

Daniel G. Brown ("Brown") appeals his jury conviction of twenty-eight counts of wire fraud in violation of 18 U.S.C. § 1343 for overcharging a wood chip client by two percent. Brown claims that the trial court erred in allowing evidence of "other acts" under FED. R. EVID. 404(b) and 403 and in allowing irrelevant and highly prejudicial witness testimony under FED. R. EVID. 401. Moreover, Brown claims that the district court failed to provide an adequate jury instruction in response to the prosecutor's propensity statements during closing arguments regarding the alleged "other acts" 404 evidence. We have jurisdiction pursuant to 8 U.S.C. § 1291. Because we reverse on the grounds that the trial court committed reversible error by failing to cure the propensity arguments, we do not consider Brown's remaining contentions regarding the district court's evidentiary rulings and motion for mistrial.

## I.

Brown co-founded Circle DE Pacific, a wood-chipping operation, located on the Kenai Peninsula in Alaska. Circle DE Pacific's principal client was Mitsui Corporation, a Japanese Corporation with offices in Seattle, Washington. Mitsui bought wood chips and then sold them to Japanese paper producers. Brown sold his wood chips "green", freshly chipped and still containing moisture, but priced them without moisture, or in "bone dry units" ("BDU"). In order to calculate the BDU of the "green" wood chips, Brown operated a laboratory in which small samples of the green chips were dried, and their weights were compared before and after drying. That calculation yielded the moisture percentage, which was then multiplied against the incoming green weight to yield the weight in BDUs.

The BDU calculation was also applied to incoming chips, which Brown obtained from both self-generated and outside sources. Brown paid some outside suppliers by "green" weight and others by BDU. As with chips sold to Mitsui, Brown's laboratory sampled chips from each truck load, determined the moisture content, and cal-

culated the number of BDUs per truck, when his contract with that provider called for BDU measurement. The laboratory also performed chip classification measurements on each incoming load. Chip classification determines the quality and price of the chip. Chip quality was particularly important to Mitsui, and as a result, the contract detailed standards for sampling chips and measuring their classification.

After Brown opened the laboratory in April 1993, he instructed Bonnie Kenner, the laboratory supervisor, to undervalue the incoming chip BDU calculations by two percent. The resulting effect was that the number of BDUs that Brown had in inventory was underestimated by that two percent value. Brown told Kenner that the reason for this manipulation was to ensure that Brown had enough inventory to supply his customers' demands. In 1994, Brown reiterated these instructions to Kenner's replacement, Penny Barnes. Brown told Barnes that the two percent adjustment was intended to compensate for inventory lost to "bum samples, lossage, blowage over the fence, and shrinkage." Brown also allegedly instructed Barnes to alter chip classification summaries provided to Mitsui when their shipments were loaded.

Mitsui took shipment of its chip orders directly at Brown's facility. The empty cargo capacity of each ship was measured by a surveyor, after which each cargo hold was filled as full as possible with chips. The chips, which were still "green" at delivery, were sampled every twenty minutes during ship loading and tested to determine moisture content. They were also tested for chip classification. The ship was surveyed again once loading was complete to compute the BDUs on board. These measurements were then used to bill Mitsui and to recalculate Brown's current inventory.

In 1996, Brown instructed Barnes to apply a two percent adjustment to chip shipments that were outgoing to Mitsui due to an inventory problem. Brown also instructed Barnes to cook incoming chips for sixteen hours during the moisture—measurement process to compute BDUs, and outgoing chips for twelve hours. Brown told her that the outgoing chips were to have "just a tweak of moisture" and that they were "selling just a little bit of water."

A federal grand jury indicted Brown on twenty-eight counts of wire fraud in violation of 18 U.S.C. § 1343 and twenty-five counts of illegal monetary transactions in violation of 18 U.S.C. § 1957(a) for devising a scheme and artifice to defraud Mitsui. The indictment alleges that "Brown directed the company laboratory technician to increase the oven dry weight of the wood chips by 2% during the sampling process as the ship was being loaded. The total BDU weight was thus falsely inflated, causing Mitsui to be over-billed by 2% for each ship load." The twenty-five counts of illegal monetary transactions were dismissed before trial.

A jury convicted Brown on twenty-eight counts of wire fraud based on allegations that between 1996 and 1998 he inflated invoices transmitted by facsimile to Mitsui. Brown was sentenced to twelve months incarceration and five years supervised release. The court also ordered Brown to pay restitution in the amount of $557,084.08, a fine, and a special assessment. Brown appeals his conviction and his denial for a mistrial alleging that the district court erred in admitting "other bad acts" evidence, in allowing certain witness testimony, and the trial judge's failure to either admonish the government or to meaningfully instruct the jury regarding the improper comments made during closing arguments.

Although it is questionable as to whether the district court abused its discretion in admitting evidence of the other acts, we reserve ruling on that issue and assume for purposes of analysis that other acts evidence was properly admitted. We reverse and remand for a new trial because the trial judge failed to instruct the jury to disregard the prosecutor's statements insofar as they suggested that Brown had a criminal propensity.

## II.

The district court granted the prosecution's motion in limine as to the use of other acts' evidence, except for the introduction of evidence regarding phantom loads, or false truck loads, since they did not have direct relevance to whether wood chips were properly weighed and the moisture content was properly determined. The evidence allowed included Brown's manipulation of incoming chip measurements, his manipulation of chip classification measurements, his manipulation of the reports to Mitsui regarding truck shipments, and his alleged underpaying of individual truckers. Defense counsel objected to this evidence at trial on the ground that it violated FED. R. EVID. 404.[1] The government argued that the other acts were relevant circumstantial evidence of Brown's intent to defraud. The government also argued that the evidence of other acts demonstrates that Brown "was willing and able to lie and cheat on these other adjustments," and therefore, "he has a propensity to lie." Defense counsel argued that the jury has to decide whether

or not directions were made incorrectly to increase the bone-dry percentage by two percent, whether they were altered with the intent to deceive the buyer, and whether or not the buyer was deceived. He stated that these other acts would not help the jury decide the issue.

The court admitted the "other acts" evidence on the theory that the trial would inevitably "come down to a swearing contest between the defendant and Penny Barnes as to what happened," and that the "other acts" evidence would demonstrate Brown's "knowledge and intent" and rebut his defense that Barnes simply manufactured the "two percent" allegations because she was a disgruntled employee. The court acknowledged that the probative value of the "other acts" evidence must be measured against its prejudicial effect under FED. R. EVID. 403, and then stated "I doubt anybody's going to get a lot of emotion out of wood chips." Furthermore, the court found that the "other acts" evidence was "sufficiently intertwined" with the evidence of crimes charged in the indictment that to prevent the jury from hearing it would give the jury a distorted picture of the events in question.

During closing argument, the government attorney quoted extensively from one of the surreptitiously recorded conversations between Brown and Barnes. The prosecutor recounted:

[Barnes] says, "Okay, so on the shiploadings, we've been doing it 12 hours like you told me to do, cook it for 12." Mr. Brown says, "Yeah." Ms. Barnes:

---

1. Rule 404(b) of the Federal Rules of Evidence provides that: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."

"Now, do you want these every day cooked to 12?" Brown: "No." Barnes: "Okay, just during the ship-loading?" Mr. Brown: "What we got coming in cook 16; going out, cook 12." That leaves a tweak, just a tweak of moisture in the going-out chips. "We're selling just a little bit of water," is what Mr. Brown says.

The prosecutor then followed with this question to the jury: "And my question to you is, if a man is willing to cheat a little bit over here, wouldn't he be willing to cheat just a little bit over here?" Defense counsel immediately objected. Without ruling on the objection, the court instructed: "The jury must consider only the charges in this case in reaching its decision, the 28 counts in the indictment." At the closing of argument, defense counsel moved for a mistrial on the basis of the prosecuting attorney's statement. The court, while finding the prosecution's statements to be "bordering on propensity evidence," did not grant the mistrial.

## III.

■■■ "Prosecutorial statements to which the defendant objects are reviewed for 'harmless error,'" while comments for which no objection is made are reviewed for plain error. *United States v. de Cruz*, 82 F.3d 856, 861 (9th Cir.1996); *United States v. Sanchez*, 176 F.3d 1214, 1218 (9th Cir.1999). "When reviewing for harmless error, we must determine 'whether allegedly improper behavior, considered in the context of the entire trial, including the conduct of the defense counsel, affected the jury's ability to judge the evidence fairly.'" *Id.* at 862 (quoting *United States v. Endicott*, 803 F.2d 506, 513 (9th Cir. 1986)). We must also look to "the substance of the curative instruction and the closeness of the case." *Id.* "An error prejudices the substantial rights of a defendant when it affects the outcome of the proceed-

ings." *United States v. Fuchs*, 218 F.3d 957, 962 (9th Cir.2000) (internal quotation marks and citation omitted).

■■■ The prosecution's closing argument relied heavily on evidence of other bad acts. During closing arguments, the prosecutor recited excerpts from Brown's conversation with Barnes regarding the cooking time for outgoing chips, including Brown's statement that they were "selling just a little bit of water." The prosecutor then said to the jury, "And my question to you is, if a man is willing to cheat a little bit over here, wouldn't he be willing to cheat just a little bit over here?" The court did not rule on defense counsel's objection to these remarks. More importantly, the court failed "[to admonish] counsel to refrain from such remarks or[to give] appropriate curative instructions to the jury." *United States v. McKoy*, 771 F.2d 1207, 1213 (9th Cir.1985); *see also Endicott*, 803 F.2d at 513. Instead the court instructed the jury to "consider only the charges in this case in reaching a decision, the 28 charges in the indictment." The court did not instruct the jury to disregard the prosecutor's statements insofar as they suggested that Brown had a criminal propensity.

Immediately following the court's curative instruction, the prosecutor presented an abbreviated timeline describing the dates Brown allegedly ordered particular adjustments to incoming and outgoing chip values. The prosecutor would ultimately conclude that Brown cheated the truckers out of five percent of their loads because "[t]hey don't know any better" while Brown was allegedly more careful with his Japanese clients. The prosecutor stated to the jury that "when you consider all the evidence in this case ... you'll find that Mr. Brown cheated the Japanese customer—but not by much, just by the 2 per-

cent." The five-percent adjustment was thereby represented as the more egregious offense, but it was uncharged and served largely to show propensity. Defense counsel did not object, and the court offered no additional instruction regarding this line of argument.

The prosecutor's statements were clearly designed to show Brown's criminal propensity, in violation of FED. R. EVID. Rule 404(b). They were also arguably an attempt to "inflame the jury" by indicating that the defendant took advantage of naïve, domestic truckers more egregiously than he did his sophisticated Japanese customer. *Cf. United States v. Williams*, 989 F.2d 1061, 1072 (9th Cir.1993) (stating that "[a] prosecutor's appeal to the jury to act as a conscience of the community is acceptable unless it is specifically designed to inflame the jury," such as by appealing to their "parochial inclinations ... with respect to ... an out-of-state defendant"). The district court's curative instruction did not tell the jury to reject the prosecutor's implication that Brown harbored a propensity to cheat his business associates, and it did not inform them that generally, propensity evidence is improper. Furthermore, it did not inform them that insofar as the cooking-time evidence was proper, it was proper only to prove intent. As a result, the instruction was inadequate to guide the jury's deliberations. Based on the disfavored nature of propensity evidence, its placement within the larger context of the prosecutor's closing argument, and the district court's failure to cure the improper statement, it is "more probable than not that the [prosecutor's misconduct] materially affected the verdict." *United States v. Christophe*, 833 F.2d 1296, 1301 (9th Cir.1987).

## IV.

The district judge failed to give appropriate curative instructions regarding the prosecution's inappropriate statements during closing argument. These statements affected the jury's ability to judge the evidence fairly.

**REVERSED and REMANDED.**

GRABER, Circuit Judge, dissenting:

I respectfully dissent. Defendant's convictions and sentence should be affirmed.

### A. *"Other Acts" Evidence*

The district court did not err in admitting "other acts" evidence.

Defendant is charged in this case with cheating Mitsui repeatedly by overcharging it 2 percent for wood chips. The government proffered evidence concerning various methods by which Defendant manipulated his wood-chip inventory: He underpaid suppliers by 5 percent; he tampered with the sampling process by undercooking the green-wood samples; he misrepresented chip sizes in loads of wood chips; he falsified reports stating the overall amount of chips in his inventory; and he intentionally over-reported the number of incoming truckloads of chips.

The district court admitted that evidence of other acts because all the methods of cheating wood-chip business associates were "inextricably intertwined." When evidence of other acts is inextricably intertwined with evidence of the charged crime, the other-acts evidence is admissible notwithstanding Federal Rule of Evidence 404. *United States v. King*, 200 F.3d 1207, 1214 (9th Cir.1999).

We review de novo the legal question whether evidence falls within the scope of Rule 404(b). *United States v. Rrapi*, 175 F.3d 742, 748 (9th Cir.1999). Here, the district court did not err in concluding that the evidence offered was "inextricably intertwined" with the crime charged. For

example, during a taped conversation with one of his laboratory assistants, Defendant discussed both the 2 percent overcharges to Mitsui—the charged conduct—and the 5 percent underpayment to suppliers—uncharged conduct—as part of the same transaction. *See id.* (stating that evidence is inextricably intertwined if it "constitutes a part of the transaction that serves as a basis for the criminal charge" (citation and internal quotation marks omitted)).

Even assuming, however, that some of the other-acts evidence was not inextricably intertwined with evidence of the charged crime, the district court still did not abuse its discretion. *See United States v. Serang,* 156 F.3d 910, 915 (9th Cir.1998) (stating our standard of review). The other-acts evidence was admissible to prove Defendant's intent to defraud. That was an element the government had to prove, *United States v. Lothian,* 976 F.2d 1257, 1267–68 (9th Cir.1992), and it expressly is a permitted reason to admit other-acts evidence, Fed.R.Evid. 404(b).

Defendant did not deny making the adjustments charged in the indictment. His claim was that he did so in order to reflect the measurement of wood chips *more* accurately, not *less* accurately. In other words, his theory was that he had committed the charged acts, but lacked fraudulent intent. This is classically a situation in which evidence about other fraudulent acts is admissible to prove intent. *See United States v. Ayers,* 924 F.2d 1468, 1473–74 (9th Cir.1991) (upholding a district court's decision to admit evidence of uncharged conduct to prove that a defendant had the requisite intent to conceal income).

The evidence thus neatly fits the four-part test we apply to determine whether "other acts" evidence is admissible to prove something other than propensity. *See United States v. Romero,* 282 F.3d 683, 688 (9th Cir.) (describing four-part test), *cert. denied,* —— U.S. ——, 123 S.Ct. 228, 154 L.Ed.2d 96 (2002).(1) There was clear evidence that the other acts occurred. (2) The other acts clearly demonstrated Defendant's intent to defraud business associates, a material element of the government's case. (3) The other acts were similar to the crime charged, because they were other attempts to enhance Defendant's wood-chip revenue by manipulating wood-chip measurements in the course of conducting the same business enterprise. (4) All the other acts took place at around the same time as the charged conduct.

Finally, the district court permissibly concluded that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Fed. R.Evid. 403.

### B.  *Luke Culver's Testimony*

The district court did not err in admitting the testimony of Luke Culver.

Defendant argues that Culver's testimony was "completely irrelevant" to any issue at trial and that "[h]is testimony merely went to the fact that he felt he had been cheated." Those assertions are plainly incorrect. Culver testified for several pages about how the wood-chip business operates and, more specifically, about how wood chips are measured.[1] By contrast, he did

---

1.  An example of Culver's testimony is his definition of a "flailer":

    It's a chain flail. It's a machine that you—and you can flail—sometimes they're in combination with a chipper, is one machine and then they're also a standalone

    flail. And it's a machine that has drums with chain on it that literally just—the tree goes through it and it beats the bark and the limbs off of the tree, so you have nothing but the white wood left to—that goes into the chipper.

not testify that he felt he had been cheated.

More specifically, Defendant complains about two questions asked at the end of Culver's direct testimony: (1) "Did [Defendant] ever tell you, Mr. Culver, that he was not paying you for 5 percent of the BDU weight that was . . . being brought in by your trucks?" (to which Culver answered, "No."). (2) "[W]ould that—a 5 percent reduction in what you were being paid, would that have been significant to you?" (to which Culver answered, "That'd be more than my profit margin.").

Defendant objected to neither question at trial on the basis of relevance or undue prejudice, which are his arguments on appeal. But even if he had preserved those issues, they would not avail him.

Defendant had placed his credibility at issue by asserting that he had ordered a 5 percent reduction in inventory innocently, had been forthright about the reduction, and had not cheated the suppliers because the reduction did not affect the suppliers' revenue. That being so, Culver's testimony was relevant.

Moreover, the questions were narrow and not inflammatory, especially in the context of Culver's rather technical and unemotional testimony. The district court was not required to exclude this testimony.

## C. *Closing Argument*

Defendant is not entitled to a reversal based on the prosecutor's closing argument.

Unquestionably, the prosecutor should not have spoken the sentence to which Defendant objected: "And my question to you is, if a man is willing to cheat a little bit over here, wouldn't he be willing to cheat just a little bit over here?" As structured, that sentence asked the jury to conclude that Defendant has a propensity to cheat.

That error does not, by itself, require reversal, however. As the majority notes, maj. op. at 871, we review for harmless error where, as here, the defendant objected. We must consider the prosecutor's erroneous comment in the context of the entire trial, and reverse only if the remark likely affected the jury's verdict. *See United States v. Frederick*, 78 F.3d 1370, 1379 (9th Cir.1996) (" 'When prosecutorial conduct is called in question, the issue is whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly.' " (quoting *United States v. Simtob*, 901 F.2d 799, 806 (9th Cir.1990))).

Viewed in the context of the entire trial, the prosecutor's erroneous statement could not have affected the jury's verdict. Thus, the error does not require reversal.

First, there was ample evidence to sustain the conviction. Defendant instructed subordinates to alter chip classification summaries sent to Mitsui, which they did, and they so testified. Defendant instructed subordinates to inflate the number of incoming truckloads on daily reports to Mitsui, which they did, and they so testified. Defendant instructed a subordinate to alter the "bone dry unit" calculations and inventory listed on reports sent to Mitsui, which she did, and she so testified.

Second, the court appropriately cautioned the jury. Immediately after Defendant objected, the court admonished the

---

Culver explained what a "chip truck" is. He testified about how many "green tons" a specialized chip-hauling van holds. He explained the meaning of a "bone dry unit" and what "$62 on board truck" means. He described the process of establishing the bone dry unit for a truckload of chips.

jury to "consider only the charges in this case in reaching its decision, the 28 counts in the indictment." Arguably, that instruction benefited Defendant by suggesting that the jury should not even consider uncharged conduct *at all,* for any purpose. In any event, the shorthand admonition must be considered in context. The court already had instructed the jury several times that Defendant was on trial only for the 28 counts charged in the indictment and that it could consider evidence of these other acts only for relevant purposes.[2] At all events, the court fully instructed the jury right after the closing arguments. The instructions explained the proper purposes for, and limitations on, other-acts evidence:

> You have heard evidence of adjustments which the Government alleges that the Defendant directed Ms. Barnes to make to the Bone Dry Units ("BDU") taken off the trucks, and to the documents classifying chips by size. The Government alleges that these adjustments understated the BDU by 5%. You have also heard evidence that certain of the Defendant's employees misstated the number of trucks delivering chips to the pile. You may consider this evidence only as it bears on the Defendant's intent and knowledge and on the relationship between the Defendant and Ms. Barnes and the context in which Ms. Barnes performed her duties, and for no

other purposes. Specifically, you are here to decide only whether the Defendant is guilty or not guilty of the charges in the indictment. Your determination is to be made only from the evidence in the case. The Defendant is not on trial for any conduct or offense not charged in the indictment, including any underpayment to the truckers or any misstatement regarding the size of chips or the number of truck deliveries to the pile. You should consider evidence about the acts, statements, and intentions of others, or evidence about other acts of the Defendant only as they relate to these charges against this Defendant.

The district court's brief admonition, right after the objectionable statement, taken in the context of the whole trial, effectively neutralized the prosecutor's error.

Third, the difference between what the prosecutor actually said, and what the prosecutor permissibly could have said, is slight and subtle. Lawyers can tell the difference, but lay jurors would not have reacted any differently. Had the prosecutor said, for example, "And my question to you is, if a man cheats a little bit over here, how can you believe his claim that he didn't intend to cheat a little bit over there?," any legal error would evaporate, but it is unimaginable that the jury would have reached a different result due to the

---

**2.** For example, on the third day of trial, the court had instructed the jury after an objection that Defendant was on trial only for the 28 counts charged:

> [Defendant] is not on trial for anything else. And any other testimony regarding so-called adjustments or falsifications of any other records, whether it be with reference to truckers with whom the company was dealing, whether it be with Mitsui on other occasions, is only relevant insofar as it helps you to understand the relationship between [Defendant] and Ms. Barnes and

how [Defendant] was instructing Ms. Barnes to perform Ms. Barnes' responsibilities as de facto supervisor of the laboratory.... So basically to the extent that the Court has allowed any evidence regarding transactions with truckers, ... anything about recording the numbers of trucks that came to the site, the quantity of inventory, all of those things are only relevant insofar as it helps you to understand Ms. Barnes' testimony and make a judgment as to whether she is telling the truth or not.

rephrasing of one sentence in a 10–page argument.

The other line of argument that the majority criticizes is not a propensity argument at all. The prosecutor asserted that Defendant had taken the opportunity to cheat vulnerable suppliers by 5 percent and argued that, "when you consider all the evidence in this case[,] ... you'll find that [he] cheated" Mitsui by 2 percent as charged. The implication was that Defendant *meant* to cheat Mitsui, even though the amount was small; 2 percent *could* be a mistake, but in this case the evidence showed intentional, fraudulent conduct. That is precisely the inference that Rule 404(b) allows a jury to draw.

In short, the majority's reversal merely for inartful phrasing is wholly unjustified under our standard of review. Therefore, I dissent.